UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

KELLEY AMADEI, CAROLA CASSARO, LAURA
CUCULLU, COREY FIELDS, ANNE GARRETT,
AMY LANIGAN, MATT O'ROURKE, ERIC POLK,
and KAREN POLK,

                              Plaintiffs,

          -against-

ELAINE DUKE, Acting Secretary of Homeland
Security, named in her official capacity,

KEVIN K. MCALEENAN, Acting Commissioner,
U.S. Customs and Border Protection, named in his
official capacity,

LEON HAYWARD, Acting Director, New York
Field Operations, U.S. Customs and Border
Protection, named in his official capacity,

FRANCIS J. RUSSO, Port Director, JFK
International Airport Port of Entry, U.S. Customs and
Border Protection, named in his official capacity,

THOMAS HOMAN, Acting Director, U.S.
Immigration and Customs Enforcement, named in his
official capacity,

THOMAS DECKER, Director, New York Field
Office, Enforcement and Removal Operations, U.S.
Immigration and Customs Enforcement, named in his
official capacity, and

DAVID JENNINGS, Director, San Francisco Field
Office, Enforcement and Removal Operations, U.S.
Immigration and Customs Enforcement, named in his
official capacity, and

JOHN DOES 1 and 2, U.S. Customs and Border
Protection officers, named in their official capacity,

                              Defendants.

Civil No. 17 Civ. 5967

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

## NATURE OF THE ACTION

1.        On February 22, 2017, U.S. Customs and Border Protection (CBP) stopped and searched every passenger on Delta Airlines Flight 1583—a domestic flight from San Francisco International Airport (SFO) to New York's John F. Kennedy International Airport (JFK)— blocking the exit door of the airplane and preventing passengers from deplaning until each produced identification documents.  The officers, acting at the request of U.S. Immigration and Customs Enforcement (ICE) and pursuant to CBP policy and practice, violated the passengers' rights against unreasonable search and seizure under the Fourth Amendment.

2.        Specifically, as Flight 1583 was arriving at the gate at JFK on February 22, the flight crew announced that all passengers would have to show identification documents to deplane.  On information and belief, CBP officers had instructed the flight crew to make those announcements.

3.        Plaintiffs, and many of their fellow passengers, expressed surprise and dismay on hearing the announcements.  Many wondered aloud what authority the government had to prevent them from leaving the airplane and require that they produce identification documents after a domestic flight.

4.        Two uniformed CBP officers positioned themselves at the doorway of the airplane, forcing passengers to queue inside and delaying their exit as the CBP officers stopped each passenger, took their identification documents, examined them, and only then permitted them to pass.

5.        The officers did not ask for the passengers' consent.  They made it clear, through their own conduct and by directing pre-arrival announcements by the flight crew, that compliance was not voluntary and that passengers would not be permitted to disembark until they showed their identification documents.

2

6.      Plaintiffs could not leave the airplane while the officers examined the documents of the passengers ahead of them, as the officers had blocked the only exit from the airplane. Plaintiffs also believed and understood, as would any reasonable person in their position, that they had no choice but to comply with the officers' demands for identification documents.

7.      On information and belief, the officers did not have a warrant permitting search or seizure of the passengers or probable cause to believe that any of the Plaintiffs, or indeed any passenger on Flight 1583, had committed a crime; nor did they have individualized reasonable suspicion to justify an investigatory stop of any of the Plaintiffs.

8.      In response to press inquiries and an inquiry from the New York Civil Liberties Union, CBP officials stated that their agency's actions on February 22, 2017, against the passengers of Flight 1583, at the request and direction of ICE, was a "routine" matter and consistent with agency policy.  In response to at least one passenger's direct inquiry during the stop, one of the CBP officers stated that the action was something that happens from "time to time."  Thus, according to CBP's own repeated statements, under its policies and "routine" practices, other domestic air passengers are subject to search and seizure in the same circumstances that occurred on Delta Airlines Flight 1583 on February 22, 2017.

9.      In light of CBP's statement that its officers' conduct was pursuant to a policy and regular practice, Plaintiffs, who are frequent passengers on domestic airline flights, are fearful that they will again be subjected to similar treatment and are in fact subject to the risk of illegal search and seizure.

10.      Plaintiffs bring this lawsuit to protect their rights under the Fourth Amendment to the U.S. Constitution and the Administrative Procedure Act (APA).  They seek declaratory and injunctive relief to prohibit Defendants and their officers and agents within CBP and ICE from

3

searching and seizing passengers on domestic flights within the United States without lawful

justification, as they did on February 22, 2017.

**PARTIES**

**Plaintiffs**

11.     Plaintiff Kelley Amadei is a woman in her forties.  She works as a consultant and

resides in Garrison, New York.  Ms. Amadei was a passenger on Delta Flight 1583.

12.     Plaintiff Carola Cassaro is a woman in her thirties.  She works as a digital product

consultant and resides in Brooklyn, New York.  Ms. Cassaro was a passenger on Delta Flight

1583.

13.     Plaintiff Laura Cucullu is a woman in her forties.  She works as a journalist and

resides in Oakland, California.  Ms. Cucullu was a passenger on Delta Flight 1583.

14.     Plaintiff Corey Fields is a man in his forties.  He is a university professor and

resides in Washington, D.C.  Dr. Fields was a passenger on Delta Flight 1583.

15.     Plaintiff Anne Garrett is a woman in her thirties.  She works as a journalist and

resides in Brooklyn, New York.  Ms. Garrett was a passenger on Delta Flight 1583.

16.     Plaintiff Amy Lanigan is a woman in her forties.  She is a marketing professional

and resides in San Francisco, California.  Ms. Lanigan was a passenger on Delta Flight 1583.

17.     Plaintiff Matt O'Rourke is a man in his forties.  He is a marketing professional

and resides in New York, New York.  Mr. O'Rourke was a passenger on Delta Flight 1583.

18.     Plaintiff Eric Polk is a man in his sixties.  He resides in East Northport, New

York.  Mr. Polk was a passenger on Delta Flight 1583.

19.     Plaintiff Karen Polk is a woman in her sixties.  She resides in East Northport,

New York.  Ms. Polk was a passenger on Delta Flight 1583.

**Defendants**

20.     Defendant Elaine Duke is Acting U.S. Secretary of Homeland Security and is named here in her official capacity.  Defendant Duke is responsible for supervising U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement; for promulgating, implementing, and enforcing the policies that govern border and immigration enforcement within the United States; and for ensuring the legality of these policies and that the officers and agents of DHS and its component agencies, CBP and ICE, comply with the Constitution and laws of the United States and DHS, CBP, and ICE policies.

21.     Defendant Kevin K. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection and is named here in his official capacity.  Defendant McAleenan is responsible for leading CBP; for promulgating, implementing, and enforcing CBP policies that govern the conduct of CBP officers; and for ensuring the legality of these policies and that officers under his supervision comply with the Constitution and laws of the United States and CBP policies.

22.     Defendant Leon Hayward is the Acting Director of New York Field Operations for U.S. Customs and Border Protection and is named here in his official capacity.  Defendant Hayward is responsible for leading the CBP New York field office including CBP's operations at the John F. Kennedy International Airport Port of Entry; for implementing and enforcing CBP policies that govern the conduct of CBP officers in the New York region; and for ensuring the legality of these policies and that officers under his supervision comply with the Constitution and laws of the United States and CBP policies.

23.     Defendant Francis Russo is the Port Director for the John F. Kennedy International Airport Port of Entry within CBP.  Defendant Russo is named here in his official capacity.  Defendant Russo supervises CBP officers in immigration and customs enforcement

activities at the international port of entry at JFK International Airport.  He is responsible for ensuring that the officers under his supervision comply with the Constitution and laws of the United States and CBP policies.

24.     Defendant Thomas Homan is the Acting Director of U.S. Immigration and Customs Enforcement.  Defendant Homan is named in his official capacity.  Defendant Homan is responsible for leading ICE; for promulgating, implementing, and enforcing ICE policies that govern the conduct of ICE officers and ICE's interactions with other law enforcement agencies; and for ensuring the legality of these policies and that the officers under his supervision comply with the Constitution and laws of the United States and ICE policies.

25.     Defendant Thomas Decker is the Director of the ICE New York Field Office, Enforcement and Removal Operations.  Defendant Decker is named here in his official capacity. Defendant Decker supervises ICE officers in immigration and customs enforcement activities within the territory of the New York Field Office.  He is responsible for ensuring that officers under his supervision comply with the Constitution and laws of the United States and ICE policies.

26.     Defendant David Jennings is the Director of the San Francisco Field Office of ICE Enforcement and Removal Operations.  Defendant Jennings is named here in his official capacity.  Defendant Jennings supervises ICE officers in immigration enforcement and removal activities within the territory of the San Francisco Field Office.  Jennings is responsible for ensuring that officers under his supervision comply with the Constitution and laws of the United States and ICE policies.

27.     Defendants DOE 1 and DOE 2 are male officers of U.S. Customs and Border Protection.  Defendants DOE 1 and DOE 2 are named here in their official capacities.

Defendants DOE 1 and DOE 2 met Delta Flight 1583 at New York's JFK airport on February 22, 2017 and illegally searched and seized each of the Plaintiffs and other passengers on Flight 1583 as described herein.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

29.    This Court has personal jurisdiction over each of the Defendants.

30.    There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court.

31.    The Court may grant injunctive and declaratory relief for the constitutional violations alleged herein pursuant to 5 U.S.C. § 702, which waives the sovereign immunity of the United States with respect to any action for injunctive relief under 28 U.S.C. § 1331, 28 U.S.C. § 2201, and/or Federal Rules of Civil Procedure 57 and 65.

32.    U.S. Customs and Border Protection has taken final agency action to the extent required by the APA, 5 U.S.C. § 704.

33.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1391(e)(1).

## STATEMENT OF FACTS

### CBP Seized and Searched All Passengers Deplaning from Domestic Flight 1583

34.    Delta Airlines Flight 1583 originated at SFO airport and landed at New York JFK airport on the evening of February 22, 2017.

35.    The plane taxied to the gate at JFK and stopped at its parking position adjacent to a mechanical jet bridge at Terminal 4.

36.     Before arriving at the gate, the flight crew told passengers over the plane's public address system that as they deplaned, they would have to show documents to officers meeting the flight.  On information and belief, CBP officers directed the flight crew to make those announcements.

37.     Many passengers expressed consternation or dismay when they heard the announcements.  They wondered aloud about the purpose of the demand for documents, who the officers were, and why all passengers would be required to show such documents after a domestic flight.  For example, Plaintiff O'Rourke observed that other passengers in the Economy Comfort seats around him, who in his experience tend to be frequent flyers like him, expressed surprise.  Plaintiff Amadei also noted that passengers around her expressed surprise at the announcements.

38.     The flight crew made at least two announcements regarding the requirement that the passengers produce documents, since passengers raised questions after the initial announcement.  A flight attendant told passengers that "documents" meant a passport or government-issued ID, and that no passengers would be allowed to deplane without showing such identification.  The flight attendant then told the passengers that they would need to have identification out and be prepared to provide any additional documentation that the officers requested.  The flight attendant reiterated that no one could disembark without showing identification to the officers.

39.     The flight attendants themselves expressed consternation as to why the passengers were being required to show identification following a domestic flight.  Plaintiff Lanigan asked a flight attendant what was going on, but the flight attendant told her that she did not know either.

40.     Following the announcements, a flight attendant opened the aircraft door between the first class and economy cabins.  That door was the only available exit from the aircraft.

41.     Immediately outside the aircraft door, at the edge of the jet bridge, stood two CBP agents—Officers DOE 1 and DOE 2.

42.     The officers positioned themselves partially blocking the exit so that passengers could not bypass the officers and deplane without submitting to the search and seizure.

43.     Plaintiffs perceived that Officers DOE 1 and DOE 2 are both physically imposing and tall.  The officers wore bulky black bulletproof vests, one of which read "POLICE / U.S. CUSTOMS AND BORDER PROTECTION."  Each carried a gun that was visible in its holster.

44.     As the plaintiffs approached the door, Officers DOE 1 and DOE 2 reached out to take each passenger's identification.  Plaintiffs observed that the officers' manner was stern and unfriendly as they detained the deplaning passengers and examined their identification documents.

45.     DOE 1 and DOE 2 reviewed each driver's license or other identification, in some instances carefully examining both the front and reverse sides of the identification while looking between the photograph on the document and the passenger's face.  DOE 1 and DOE 2 did not merely check the passengers' names, but rather reviewed other information provided on the identification documents.

46.     Despite the focus on the identification documents, DOE 1 and DOE 2 carried no clipboard, photograph, or list of names and did not appear to check the passengers' identification against any list.

47.     DOE 1 and DOE 2 permitted each passenger to proceed only after they indicated that they had completed their review of the passenger's identification document.

48.     DOE 1 and DOE 2 made a coercive display to the passengers, as shown by the experience of Plaintiff Amadei, who was traveling with her spouse and seven-year-old son (who was with her as she deplaned).  Ms. Amadei is and appears to be white, whereas her son has darker skin.  One of the officers closely examined Ms. Amadei's identification document and then stared back and forth at Ms. Amadei and her son, thus further delaying their exit from the plane.  Ms. Amadei was upset and alarmed by this wordless exchange and finally told the officer that her son is only seven years old and does not carry identification.  Only then did the officer reply, "you're okay," and permit Ms. Amadei and her young child to deplane.  As they left the plane, Ms. Amadei's son was visibly shaken and upset by the CBP officers and asked her if their family was in trouble and whether everything was okay.

49.     During and after the searches, DOE 1 and DOE 2 refused to explain CBP's justification for the searches despite passengers' requests for more information and attempts to question the officers' actions in stopping them and searching their documents.  For example, when Plaintiff Garrett asked, "why do you need to see this identification," the officer did not respond and instead just took the identification card out of her hand.  Similarly, when Plaintiff Cassaro asked whether the document checks were standard procedure or something new, the officer responded "no" without even looking up to Ms. Cassaro to make eye contact.  Plaintiff Cucullu asked the officer, "what is going on," and he responded, "I can't tell you anything, but all I can tell you is that it's for a very specific reason."

50.     Ms. Amadei, who was particularly distressed by the incident because it had upset her seven-year-old son, and her son met up with her spouse (who had been sitting apart from Ms. Amadei) a short distance from the jet bridge.  After escorting her family out of the gate area, Ms. Amadei turned back and encountered DOE 1 and DOE 2 standing nearby, having concluded the

10

searches.  When Ms. Amadei asked one of the defendant officers why the passengers had been searched, the officer responded that "it's not for you to worry about; we do it from time to time," or words to that effect.

51.     Plaintiffs did not consent to any search or seizure as they were attempting to deplane Flight 1583.  Instead, they understood from the circumstances, as set forth above, that the stop and search was mandatory and that they were not free to deplane without submitting to the officers. The coercive circumstances included the announcements made by the flight crew at CBP's direction, the presence of two large armed CBP officers obstructing the only means of egress from the plane, and the words and actions of those officers, as described above.

52.     In these circumstances, any reasonable person in Plaintiffs' position would have understood that he or she was not free to leave the airplane without first submitting to the officers' demands to take and inspect their identification documents.

53.     As a result of the CBP officers' actions and the Defendants' policies permitting these actions, each of the Plaintiffs was seized and searched without lawful justification.  Each Plaintiff was subjected to a seizure during the CBP officers' search of their identity document and also during the period in which each Plaintiff was delayed in deplaning because each passenger ahead of him or her had to submit to a similar seizure and search.

54.     On information and belief, CBP did not possess a valid judicial warrant authorizing any seizure of Flight 1583 passengers or any search of passenger identification documents; nor did the officers have individualized reasonable suspicion that any passenger, much less all passengers, had engaged in criminal activity.

55.     Plaintiffs were frightened, angry, and alarmed following the searches.  The officers had no justification for detaining Plaintiffs while they checked every passenger's

identification document, and they lacked any basis for demanding that each passenger produce

identification.  Some shared their surprise and indignation with friends and family, as well as

with the news media, which quickly reported the incident.

**CBP Justifies the Blanket Searches as "Routine" and in Accordance with Policy**

56.     In response to media reports about the incident, CBP attempted to justify its

actions by asserting that the officers involved were searching for a specific person subject to

removal from the United States, that searches like those that occurred on Flight 1583 are routine,

and that the officers acted pursuant to longstanding CBP policy, citing regulations permitting

searches of passengers arriving from abroad.

57.     First, in a public statement released on February 23, 2017, CBP explained:

U.S. Customs and Border Protection (CBP) at John F. Kennedy Airport was
contacted by U.S. Immigration and Customs Enforcement (ICE) yesterday,
February 22, 2017, to assist in locating an individual possibly aboard Delta flight
1583 from San Francisco International Airport to JFK. This individual was
ordered removed by an immigration judge. To assist our law enforcement
partners, two CBP officers requested identification from those on the flight in
order to help identify the individual. The individual was determined not to be on
the flight.

CBP often receives requests from our law enforcement partners to assist in
various ways, including identifying a person of interest. CBP will assist when able
to.

58.     Notably, the CBP statement provided no indication that submission to the

searches conducted by DOE 1 and DOE 2 was voluntary and cited no authority to conduct

searches of domestic passengers.

59.     The CBP statement likewise provided no explanation for why the officers stopped

and searched every passenger, when CBP was allegedly searching for a particular person and, on

information and belief, had or could have obtained a flight manifest showing the names of each

passenger and the passenger's assigned seat on the plane.

60.     Even assuming that CBP had a specific and detailed description of the individual sought, nothing in CBP's public statements about its searches and seizures could provide the necessary individualized suspicion to justify an investigatory stop of every adult passenger. DOE 1 and DOE 2 reviewed the identification documents of passengers of different ages, genders, and races, including the Plaintiffs, who are of different ages and races and include both women and men.  For instance, they stopped and examined the identification of each Plaintiff, including Plaintiff Fields, an African-American man in his forties, and Plaintiffs Eric and Karen Polk, who are a white man and white woman, both in their sixties.

61.     When asked by news media to clarify whether officers merely requested identification or whether passengers were required to submit to a demand, CBP responded that "[i]t is always best to cooperate with law enforcement, so as to expedite your exiting the airport in a timely manner."[1]

62.     CBP subsequently followed up with an incorrect statement claiming that the CBP officers had requested "consensual assistance from passengers aboard the flight" and that the passengers had cooperated.[2]  Plaintiffs were not asked to consent and did not in fact consent to the stop and search.

63.     Separately, a CBP spokesperson also stated that such identification checks are "not a new policy" and that it is "not unusual for us to assist our fellow law-enforcement agencies."[3]

---

[1] Rolling Stone, Border Patrol Agents Stop Domestic Travelers at New York Airport, Feb. 23, 2017, available at http://www.rollingstone.com/politics/news/border-patrol-agents-stop-domestic-travelers-at-new-york-airport-w468643 (hereinafter, "Rolling Stone article").

[2] *Id.*

[3] Gothamist, Customs Agents Checked IDs Of Domestic Flight Passengers at JFK, Feb. 23, 2017, available at http://gothamist.com/2017/02/23/jfk_domestic_flight_id_checks.php.

64.     Another DHS official asserted that such searches and collaboration between CBP and ICE are "routine."[4]

65.     Defendant Russo, the Port Director of CBP's JFK Port of Entry, repeated those assertions in email correspondence on February 23.[5]  Mr. Russo stated that "[w]e were simply assisting our sister agency in tracking down one individual" and repeated CBP's statement that the "individual was ordered removed by an immigration judge for domestic assault and other crimes committed."[6]  According to Defendant Russo, CBP agreed to conduct the search because "[w]e were asked by ICE/ERO to identify the individual as he arrived off the flight from San Francisco because ICE was unable to get to the flight on time."[7]  Mr. Russo asserted that "[w]e do this every day.  Someone took a picture and put it on twitter.  That's what led to the hysteria."[8]

66.     On information and belief, Defendant Russo's statement that "[w]e were asked by ICE/ERO to identify the individual"[9] indicated his belief that the Enforcement and Removal Office of U.S. Immigration and Customs Enforcement—led by Defendant Decker in New York and by Defendant Jennings in San Francisco—made the request.

67.     In response to media requests for CBP's authority to detain and demand identity documents from deplaning domestic passengers, a CBP spokesperson referred to a document

---

[4] The Independent, US Federal Agents Ask Domestic Flight Passengers to Show IDs, Feb. 24, 2017, available at http://www.independent.co.uk/news/world/americas/us-federal-agents-ask-domestic-flight-passengers-to-show-ids-in-search-for-undocumented-immigrant-a7597446.html.

[5] Emails of F. Russo with J. Wells, Feb. 23, 2017 (attached as **Exhibit A**).

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

posted on the agency's website entitled "CBP Search Authority"[10] that, by its plain terms, does

not provide such authority.

68.    Although that document refers to "federal statutes and regulations" from which

CBP officers derive their "border search authority," the document nowhere provides

authorization to search passengers arriving on domestic flights. Specifically, the CBP Search

Authority document cites 19 C.F.R. § 162.6, the regulation that governs CBP's authority to

search passengers entering the United States from abroad.  Section 162.6 reads:

> All persons, baggage, and merchandise arriving in the Customs territory of the
> United States from places outside thereof are liable to inspection and search by a
> Customs officer. Port directors and special agents in charge are authorized to
> cause inspection, examination, and search to be made under section 467, Tariff
> Act of 1930, as amended (19 U.S.C. 1467), of persons, baggage, or merchandise,
> even though such persons, baggage, or merchandise were inspected, examined,
> searched, or taken on board the vessel at another port or place in the United States
> or the Virgin Islands, if such action is deemed necessary or appropriate.

19 C.F.R. § 162.6.

69.    Section 162.6 was promulgated in part pursuant to 19 U.S.C. § 1467, which

authorizes CBP to conduct customs-related border searches, but neither 19 C.F.R. § 162.6 nor 19

U.S.C. § 1467 confers authority on CBP to search passengers on a flight that originated from and

arrived at a location inside the United States where there is no indication that those passengers

were arriving from abroad.

70.    Following the publicity surrounding Flight 1583, members of Congress expressed

concern regarding CBP assertions of authority to conduct warrantless searches of domestic

airplane passengers.  In particular, on February 24, 2017, the Honorable Bennie G. Thompson, a

member of the U.S. House of Representatives and Ranking Member of the House Homeland

---

[10] Rolling Stone article, *supra* note 1 (linking to Customs and Border Protection, CBP Search
Authority, available at https://www.cbp.gov/travel/cbp-search-authority).

Security Committee, wrote to ICE and CBP, stating that "[i]t is . . . troubling that CBP officers called to assist apparently chose to require passengers, including U.S. citizens, to produce identification before disembarking, rather than confirming whether the individual was on the flight either by visual inspection, checking the passenger manifest, or confirming with ICE that the individual was aboard."[11]  Representative Thompson noted his "understanding that the individual in question was not found, because ICE had not actually placed the individual on the flight in San Francisco" and sought written answers by March 10, 2017 to questions, including "[w]hy did CBP personnel require passengers, including U.S. citizens, to provide identification prior to disembarking a domestic flight?" and "[w]hat legal authority does CBP have for doing so?"[12]

71.    On information and belief, CBP and ICE have not responded to Representative Thompson's inquiries.

72.    On September 13, 2017, Plaintiffs' counsel sent a letter to Defendants Duke, McAleenan, Russo, Homan, Decker, and Jennings asking that they clarify whether CBP policy permits agents to stop every passenger on a U.S. domestic flight and require every passenger to produce identification documents before being permitted to disembark and, if so, the legal authority they assert to justify that policy.

---

[11] The Hill, Dem Seeks Answers on Agents IDing Passengers as They Left Domestic Flight, Feb. 24, 2017, available at http://thehill.com/policy/transportation/321129-dem-seeks-answers-on-agents-iding-passengers-as-they-left-domestic.

[12] Letter of the Hon. Bennie G. Thompson to Thomas D. Homan, Acting Director, U.S. Immigration and Customs Enforcement and Kevin K. McAleenan, Acting Commissioner, U.S. Customs and Border Protection, Feb. 24, 2017.  The letter is attached to this Complaint as **Exhibit B** and hereby incorporated by reference.

73.     Apart from an email from the Department of Homeland Security's Office of General Counsel acknowledging receipt of the September 13 letter, Defendants have not responded to the letter.

**Need for Declaratory and Injunctive Relief**

74.     Plaintiffs are regular travelers on domestic flights within the United States, and they intend to take other domestic flights.

75.     In light of CBP's public statements regarding its searches and seizures of Plaintiffs and other passengers on Flight 1583, Plaintiffs fear that when they travel again, they will be subject to another warrantless search and seizure as took place following Delta 1583.

76.     Absent injunctive relief, and in light of CBP's assertions that its searches and seizures were pursuant to policy and "routine" practice, Plaintiffs are subject to further violations of their Fourth Amendment rights similar to those they experienced upon the arrival of Flight 1583.

## CLAIM ONE

### VIOLATION OF THE FOURTH AMENDMENT TO THE U.S. CONSTITUTION

77.     Each of the foregoing allegations is incorporated by reference.

78.     The Fourth Amendment to the U.S. Constitution protects Plaintiffs from unreasonable searches and seizures.

79.     CBP officers DOE 1 and DOE 2's seizure and search of the Plaintiffs were not based on probable cause to believe that Plaintiffs had committed a crime, were not authorized by judicial warrant, and did not fall within any exception to the warrant requirement.  The search and seizure violated Plaintiffs' Fourth Amendment rights.

80.     The seizure of Plaintiffs was not a lawful *Terry* stop, as DOE 1 and DOE 2 did not have individualized suspicion that Plaintiffs were engaged in illegal conduct.

81.     In conducting the illegal stop and seizure of Plaintiffs and other passengers on Flight 1583, the CBP officers DOE 1 and DOE 2 acted upon the request of ICE agents and pursuant to agency policy and "routine" practice.

82.     Defendants are liable for promulgating and implementing the policy by which ICE requested that CBP conduct a warrantless and suspicionless search and seizure of the Delta Flight 1583 passengers and their documents.

83.     Defendants are liable for promulgating any policy by which CBP claims authority to conduct warrantless and suspicionless seizures and searches of domestic airline passengers.

84.     Defendants are liable for the failure of ICE and CBP agents to respect Plaintiffs' constitutional rights against unlawful searches and seizures by virtue of the implementation of such policy.

85.     Defendants are liable for the unlawful application of such policy to Plaintiffs following Delta Flight 1583 on February 22, 2017.

86.     The Fourth Amendment violation is likely to recur.  Plaintiffs intend to take domestic flights regularly within the United States, and CBP has stated that it conducted the blanket searches on Flight 1583 pursuant to its policy, that its actions were "routine," that it "often receives requests" for similar assistance from ICE and other law enforcement agencies, and that it is "not unusual" for CBP to provide such assistance.  Defendants have refused to provide assurances that such seizures and searches will not recur.

87.     The violation of Plaintiffs' rights through additional warrantless and suspicionless searches and seizures following domestic flights would cause Plaintiffs further irreparable harm.

88.     Plaintiffs have no adequate remedy at law for the violation of their Fourth Amendment rights.

**CLAIM TWO**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A)-(C)**

89.     Each of the foregoing allegations is incorporated by reference.

90.     There is no legal authority that permits CBP to conduct warrantless and suspicionless searches and seizures of domestic passengers.

91.     Nonetheless, CBP has stated that it conducted the blanket searches on Flight 1583 pursuant to its policy and referenced a document entitled "CBP Search Authority," which cites to 19 C.F.R. § 162.6.

92.     To the extent that Defendants contend that CBP possesses such authority pursuant to 19 C.F.R. § 162.6, or any other agency policy, that regulation or policy must be set aside as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, contrary to constitutional rights, and outside Defendants' statutory authority, under the APA, 5 U.S.C. § 706(2)(A)-(C).

93.     Such a regulation or policy would constitute final agency action subject to judicial review within the meaning of the APA, 5 U.S.C. § 704.

94.     Defendants' unlawful conduct has adversely affected Plaintiffs and placed them at imminent risk of suffering further harm absent the relief requested below.

95.     Plaintiffs have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief:

1.     A declaration that the seizure and search of Plaintiffs as they deplaned Flight 1583 on February 22, 2017 conducted by CBP officers violated Plaintiffs' Fourth Amendment rights;

19

2.      A declaration that the rule or policy pursuant to which CBP conducted the illegal

search and seizure of Plaintiffs as they deplaned Flight 1583 on February 22, 2017, including but

not limited to 19 C.F.R. § 162.6, is unconstitutional, arbitrary and capricious, an abuse of

discretion, contrary to law, and in excess of statutory authority, and is therefore invalid under the

APA;

3.      A permanent injunction barring Defendants and their agencies from seizing and

conducting warrantless and/or suspicionless identification checks of passengers disembarking

from domestic flights;

4.      Reasonable attorneys' fees and costs; and

5.      Such other relief as this Court deems appropriate.

Respectfully submitted,


/s/ Neil K. Roman
Neil K. Roman
Joshua B. Picker
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, N.Y. 10018
(212) 841-1000 (Telephone)
(212) 841-1010 (Fax)

Cecillia D. Wang
Katrina Eiland
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
39 Drumm Street
San Francisco, CA  94111
(415) 343-0775 (Telephone)
(415) 395-0950 (Fax)

Hugh Handeyside
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York NY 10004
(212) 549-2500 (Telephone)

Clara J. Shin
Samantha Choe
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
(415) 591-6000 (Telephone)
(415) 591-6091 (Fax)

Lala R. Qadir
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-5013 (Telephone)
(202) 778-5013 (Fax)

*Attorneys for Plaintiffs*

October 12, 2017