```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    --------------------------------X
                                      :
 4    KELLEY AMADEI, et al.,          :
                                      :   17-CV-05967 (NGG)
 5                   Plaintiffs,      :
                                      :
 6              v.                    :
                                      :   May 1, 2018
 7    ELAINE DUKE, et al.,            :   Brooklyn, New York
                                      :
 8                   Defendants.      :
                                      :
 9    --------------------------------X

10

11           TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
               BEFORE THE HONORABLE VERA M. SCANLON
12                UNITED STATES MAGISTRATE JUDGE

13    APPEARANCES:

14

15    For the Plaintiff:        HUGH HANDEYSIDE, ESQ.
                                American Civil Liberties Union
16                               Foundation
                                125 Broad Street, 18th Floor
17                              New York, New York 10004

18                              JOSHUA B. PICKER, ESQ.
                                Covington & Burling LLP
19                              620 8th Avenue, 42nd Floor
                                New York, New York 10018
20
      For the Defendants:       DARA A. OLDS, ESQ.
21                              United States Attorney's Office
                                271 Cadman Plaza East
22                              Brooklyn, New York 11201

23

24    Court Transcriber:        MARY GRECO
                                TypeWrite Word Processing Service
25                              211 N. Milton Road
                                Saratoga Springs, New York 12866


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

2

1   (Proceedings began at 11:38 a.m.)

2        THE COURT:  This is <u>Amadei v. Duke</u>, 17-CV-5967.

3   Let's start with counsels' appearance.  So first for the

4   plaintiff?

5        MR. HANDEYSIDE:  Hugh Handeyside, Your Honor, of the

6   American Civil Liberties Union on behalf of plaintiffs.

7        MR. PICKER:  And Josh Picker from Covington &

8   Burling on behalf of the plaintiffs.

9        THE COURT:  Government?

10       MS. OLDS:  Good morning, Your Honor.  Dara Olds from

11  the US Attorney's Office on behalf of defendants.

12       THE COURT:  Okay.  So first, thanks for

13  accommodating the change in time and I hope we can cover

14  everything but I need to leave by 10 to 1.  Hopefully we'll be

15  finished earlier but we'll figure out what to do.

16       So a couple of things.  One, the proposed

17  stipulation with regard to the confidential exchange of

18  materials.  This has been a little bit of a discussion point,

19  not really a ruling.  But I'd like to know your thoughts on

20  this.  So just for the record, I'm talking about the document

21  that's found that 26-1 which is the proposed stipulation order

22  for the protection documents and information.  Several times

23  in this document it references the law enforcement privilege.

24  And this is the reason why you want this confidentiality order

25  signed.  There are other reasons presumably, the Privacy Act

1    being a significant one.  I'm raising this because I'm not

2    sure what the answer is and I'm trying to avoid there being a

3    problem down the line.  So my understanding of how this works

4    is with -- let me back up.  I was surprised to see you saying

5    you're exchanging privileged documents.  That was really the

6    issue because while the Second Circuit -- my understanding,

7    this was a very quick research, if I'm wrong I'm wrong and you

8    can correct me, is that most circuits, I think except for two,

9    it's a wave of a privilege is a waiver of a privilege.  The

10   Second Circuit I understand it takes a case-by-case approach

11   and there's some discussion in cases that if you include a

12   non-waiver provision in a confidentiality agreement or order

13   that that reads as a non-waiver.  I don't know.  I don't know

14   where this would end up if anyone came back and said look, you

15   provided the information in this case and you waived any law

16   enforcement privilege.  Maybe no one will care to see these

17   documents other than here.  Maybe there is clearly a reading

18   of the law enforcement privilege and the case law in this

19   circuit that there are no issues here.  But I don't want this

20   to go blindly down the path and there be -- you know, if we

21   can avoid problems down the line -- and I'm not -- so really I

22   want to know what your thoughts are about this and if this is

23   really what you want to be saying in this agreement.  So first

24   for the Government?  You can stay seated while you're --

25             MS. OLDS:  Oh, okay.  Just trying to understand Your

4

1  Honor's concern.  Is it the concern is that the proposed

2  protective order includes that some of the documents that are

3  going to be produced could be subject to being delivered --

4  the law enforcement privilege?

5          THE COURT:  Right.  So in the second -- this is Page

6  1.  The second whereas clause it says, "Defendants contend

7  such information, documents are protected by the law

8  enforcement privilege and/or concern highly sensitive or

9  confidential matters that would jeopardize the objectives of

10 law enforcement if released to the public," which seems like a

11 general description of the law enforcement privilege.  Then in

12 the second full paragraph on Page 2 you mentioned various

13 privileges.  The third whereas clause fully on Page 2 says,

14 you know, your concern is the documents are relevant without

15 making this confidential or privileged information public.

16 Paragraph 1, law enforcement privilege.  Paragraph 7, law

17 enforcement privilege.  Take a simple example, right, because

18 Fifth Amendment privilege and you share the information,

19 you've blown the privilege.  You know, there's not that many

20 ways around that.  Same thing with certainly attorney work

21 product.  Privilege -- I'm sorry, I should also add 23 has,

22 Paragraph 23 might satisfy the waiver provision but it just --

23 the non-waiver provision.  So my understanding is other

24 circuits would say once a privilege is waived, the privilege

25 is waived.  But this circuit has more fact specific case-by-

1   case approach.  I don't have a view as to what you should say.

2   What I'm asking about is I read this document you're asking me

3   to sign it so that it's so ordered and it has this language in

4   it and I don't know where this would end up down the line in

5   terms of whether this is a waiver, whether it's a full waiver,

6   a partial waiver, whether the exclusion language is

7   sufficient.  I don't know what these documents are that you --

8   you know, take a different example.  I probably have more New

9   York City Police Department cases with regard to law

10  enforcement privilege.  But we have heated battles about the

11  law enforcement privilege material should be turned over.  Now

12  sometimes the failure to turn it over because of the privilege

13  creates problems for defendants because then they have a

14  harder time justifying their conduct or whatever.  Generic

15  statements.  I just noted that I don't see law enforcement --

16  I don't see privilege waivers and confidentiality

17  stipulations.  I can't even think of when I have seen

18  something like that.  So I'm asking the question is this

19  really what you want?  Is this what you're all interested in?

20  And if you do, okay.  But if you haven't thought about it,

21  then I'd like to know that you have thought about it and you

22  decide you're either revising this or -- you know, it's fine.

23          MS. OLDS:  I think it's fine as is and I think part

24  of the reason why it's worded that way in discussions with the

25  plaintiff's counsel, there may be some documents that we may -

6

1   - may be subject to such a privilege but we would produce on

2   the condition that they not be made public which is part of

3   our concern with this case that even to the extent that they

4   agreed to produce certain things it doesn't mean that we would

5   want them released.  There may be -- we may be comfortable

6   producing them in the context of the litigation but not for

7   them to become public.  And so I think also plaintiff's

8   counsel is not -- had some concerns about us possibly labeling

9   them as subject to the law enforcement privilege, so the

10  language was changed to say that we contend it might be

11  subject to such a privilege.  So Your Honor's concern as to

12  whether it would be waived just based on the production,

13  that's an interesting question.  But I do think at least to

14  the extent the parties had to litigate that where plaintiff

15  challenged the designation as produced but subject to a

16  certain privilege, at least while that litigation is going on

17  the information wouldn't be released to the public to the

18  extent that that litigation -- to the extent that that

19  challenge came up in this case.

20          THE COURT:  That sounds like it's procedurally

21  correct.  The two scenarios I envision is that somehow the

22  protection for the documents, either this case is weakened

23  because you have in producing at least some documents you say

24  are privileged produced it or a non-party is interested in

25  these documents and says look, they waived it.  And this is

7

1    really, you know, your concern and your documents.  You

2    mutually agreed to the language.  I'm not opposed to that

3    language if it is what you want so ordered.  But it seems to

4    me that this could be a problem down the line unless this is

5    what you really want or you're sure that the Second Circuit

6    language would give you the level of protection that you want,

7    which it might.  I'm really not weighing in saying oh this is

8    a problem.  I'm saying I think in another circuit this would

9    definitely have a strong chance of being a problem.  Here

10   maybe, maybe not.

11          Look, there's some other changes I want you to make

12   in this before I sign it so why don't you just revisit that.

13          MS. OLDS:  Okay.

14          THE COURT:  So a couple of them are just drafting

15   questions.  5B, this is information designated as confidential

16   information may be disclosed to the following parties.  So I

17   think one is a typo which -- sorry.  So B4, I think you mean

18   16.  But I am not -- I don't want -- there shouldn't be any

19   restrictions in this document on the Court's access to the

20   materials.  The Court has our own rules about who can see

21   materials if something is filed under seal, who can see it,

22   what should happen.  But there's no limitation imposed by this

23   agreement on the Court or its personnel.  So not sure what

24   [indiscernible] is getting at.  So this would be, sorry,

25   Paragraph 5B4.  It's somewhat awkwardly phrased.  I think

8

1   you're talking about Paragraph 16 and you can't impose

2   restrictions on the Court.  So you need to revise that.

3          And then I was a little bit confused because

4   Paragraph 7, for example, says, suggests the information could

5   be -- sorry, I said 7 but I mean 5B7.  So witnesses of any

6   deposition in this action subject to revisions of Paragraph 6

7   of this protective order which is the paragraph that talks

8   about giving a copy of the last page of this order to the

9   person confirming they have reviewed it.  I'm not sure why

10  that restriction doesn't apply to other individuals who are

11  here other than the Court.  This is really your issue but the

12  court reporters, the experts, consultants, the witnesses'

13  expected testimony at trial, you know, that's a little if-ier

14  because I'm not sure you're going to be able to have any

15  restrictions at trial, but whatever.  That's a problem for

16  another day.  But I'm not sure, I wasn't clear at all about

17  the structure of this because it's only one group I think,

18  right?  One group who is supposed to look at Paragraph 6.  I

19  don't really think that's what you want.  But I think you

20  should work out what you are looking for and take out the

21  restriction for the Court.

22         And then I was confused about how you see the

23  attorneys eyes only provision working.  So Paragraph 7, Page 4

24  makes a provision for attorneys eyes only.  And then 8

25  describes what would be covered by the attorneys eyes only

9

1   provision.  9 has a little bit more information about

2   attorneys eyes only.  But then -- okay, so 12, counsel, right

3   of access to all materials designated confidential information

4   should be limited to the following author as individual A a

5   description of counsel.  Well that's fine.  But then I don't

6   understand B, C, D.  You know, that's not attorneys eyes only.

7   I mean that something else.  I don't know if it's somewhat

8   more restrictive disclosure other than confidential that

9   you're looking for or something that they can only be shown

10  copies but not take.  I don't know what you are looking for

11  there but it's not attorneys eyes only.  My view of attorneys

12  eyes only is exactly what it says, the attorneys, maybe their

13  staff, which is what you have described in 12A.  So is there

14  something missing here or --

15          MR. HANDEYSIDE:  Not from plaintiff, Your Honor.  We

16  can certainly revisit that.  And I understand the concern.

17          MS. OLDS:  Same, Your Honor.  I think our main

18  concern was with confidential information attorneys eyes only

19  is it doesn't mean it's not available to the client.  But I

20  understand what Your Honor is saying.

21          THE COURT:  You can set up what you'd like but I

22  think it should be described more clearly.  Don't use the term

23  attorneys eyes only if that's not what you mean.  Or if you do

24  mean it and you want to describe some slightly more broader

25  than that -- just to take another City example, right, often

1   the information is specifically not available to the client.

2   So in a 1983 action, for example, witness information involved

3   in a criminal case, you know, it never went to trial, might

4   not be shown to the plaintiff because of a concern that there

5   might be an interaction between the plaintiff and the witness.

6   But the attorney can have it to work with it, right?  It

7   literally means attorneys eyes only, not the client.  And then

8   we work out issues as it goes forward depending on what the

9   investigation reveals that comes out of the attorney looking

10  at that information.  But anyway, I think that should be

11  clarified.

12         And then 14, if I understand it, you're saying

13  everybody needs to sign this protective order.  The Court's

14  not going to sign that.  So all of these provisions that are

15  global or almost global you need to take out, or you need to

16  exclude the Court.

17         And then the sealing, Paragraphs 16, the sentences

18  that talk about well you can file this and file that, this

19  should just say you will follow the Court's local rules and

20  the judge's individual rules with regard to sealing.  We're

21  not going to -- because this sets up I think it was the five-

22  day period in which you could support the motion.  You should

23  follow the rules, not have it be more complicated.

24         And here's a personal pet concern, but Paragraph 18

25  talks about magistrate, it would be a magistrate judge.  I was

1   looking at Paragraph 19.  I'm not sure -- you know, you have

2   this phrase without disclosing the confidential information.

3   I think what you're saying is without disclosing it publicly.

4   I'm not sure what the process is that you envision.  And then

5   Paragraph 20, which this is about the return of information.

6   It's my general practice to permit the receiving party,

7   counsel and the client to keep one master set of the

8   production.  I think that it's not in keeping with the ethics

9   rules for the counsel not to have a set of the materials that

10  were used in the case particularly if -- I don't think this is

11  the kind of case but if there's a case where there could be a

12  malpractice claim.

13        And then 23 is I think the paragraph that you are

14  using as the non-waiver paragraph.  So this is the question I

15  started with about whether it was sufficient, whether you do

16  want law enforcement language in there, et cetera.

17        Those are my concerns.  I know some of the

18  production that you're talking about making has been held up

19  because you wanted that resolved.  So when do you want to

20  submit a revised agreement?  I'm just going to talk to my law

21  clerk for a couple of seconds.

22                    [Pause in proceedings.]

23        THE COURT:  Just one other point the law clerk

24  raised I think is correct drafting.  I understood that

25  Paragraph 1, Page 2, "The United States and its agencies,

1   employees are authorized pursuant to 5 USC Section

2   553(a)(B)(11) to produce such records pursuant to the terms

3   contained herein." I think that provision only refers to

4   documents that you are now authorized to produce that would be

5   covered by the Privacy Act. That's not referring to the law

6   enforcement privilege or otherwise sensitive confidential

7   information. I think that's what that's about. Right?

8   That's what 5 USC is about?

9           MS. OLDS: Yes.

10          THE COURT: So I think you should just clarify that

11  point.

12          So when do you think you'll be able to submit a

13  revised document?

14                  [Pause in Proceedings.]

15          MS. OLDS: Your Honor, the parties think by the end

16  of the week that we could submit a revised proposed protective

17  order.

18          THE COURT: All right. So that's 5/4.

19          Then going to a letter of April 26, are there any

20  developments since you filed that? Or jump in.

21          MS. OLDS: Yes, Your Honor. Actually we discussed a

22  few things between the parties and we have been able to --

23  there are main issues that we'd like to raise with the Court

24  at this point which I believe is plaintiff's bullet 1 and

25  defendant's bullet 2. The remainder of the issues raised in

13

1   the letter the parties have agreed upon or are conferring to

2   come to an agreement.

3           THE COURT:  So plaintiffs, I'm sorry, say that

4   again?  Plaintiff's bullet 1?  So that's the scope of

5   discovery?

6           MS. OLDS:  That's correct, Your Honor.

7           THE COURT:  Right.  Okay.  And I'm sorry, what was

8   the other one?

9           MS. OLDS:  Defendant's position with respect to

10  interrogatory Number 8.

11          THE COURT:  Number 8.  Okay.  Everything else you

12  worked out or are working out?

13          MS. OLDS:  Correct.  We have resolved an

14  [indiscernible] finally believe that we can come to an

15  agreement with respect to the remaining issues.

16          THE COURT:  Okay.  So let's talk about -- I'll start

17  with defendant's response.  So this is sort of at the heart of

18  your policy case, right?  This is -- is this about New York,

19  New York area, or is this a national issue?

20          MS. OLDS:  That's correct, Your Honor.

21          THE COURT:  I was a little bit -- I'm confused.  It

22  might be hopefully a slight overstatement.  But your

23  respective take on whether anything -- I'm not saying this

24  well.  So as I understand it, defendant's position is there is

25  no nationwide policy.  This is --

1          MS. OLDS:  Well, that's part of the position as to

2     why there doesn't need to be an additional search.  But we

3     also have the position that --

4          THE COURT:  The standing.

5          MS. OLDS:  -- this incident happened at JFK and the

6     person who's responsible for implementing national policy at

7     JFK is Francis Russo and would have whatever national policies

8     would be implemented at JFK.  And so that's why we think that

9     that search is sufficient.  And the same with respect to ICE

10    ERO.  If anything, with respect to ICE, ICE has already

11    explained their procedures with respect to this and has never

12    conducted such a search of plaintiff.  So it's really -- it

13    really doesn't make any sense within the context of this case

14    to require either agency really to conduct a nationwide search

15    or a search beyond where this incident happened.  This is the

16    only incident that plaintiffs allege and they really don't

17    allege any facts to suggest that this has happened anyplace

18    else.  And so we certainly think the policies in effect at JFK

19    are what's relevant particularly because this is an NAPA

20    review case.  And so what plaintiffs are entitled to are what

21    the people there relied on in conducting this action.  So

22    that's what employees at JFK would rely on the policies

23    implemented there.  If they are national policies and

24    implemented there, then they would be entitled to those.  They

25    would be there and we would produce those to plaintiff.  But

1  to require them to do a burdensome and such a broad search for

2  this one incident is just outside the scope and not

3  proportional to the needs of this case.

4           THE COURT:  So there's the policy question and then

5  there's the fact specific questions as I understand it.

6  Right?  There's also the request, they want the document,

7  interrogatory responses addressing other instances where CBP

8  and ICE sought to identify and receive identification from

9  passengers disembarking from US domestic flights.

10           MS. OLDS:  Right.  That's extremely --

11           THE COURT:  What's your view about that?

12           MS. OLDS:  That's extremely broad, Your Honor,

13  because identifying passengers is not what they are contending

14  was the unconstitutional action that took place here.  I mean

15  ICE removes people and sometimes those people are on flights.

16  So every time that ICE has identified someone on a flight from

17  2015 to today is extremely broad.  But again, I think the main

18  issue is that this has occurred to these plaintiffs on one

19  occasion.  This is not like a class action case.  This is this

20  group of plaintiffs.  This has happened to them one time.  And

21  so at this specific location.  And so we do agree that they

22  would be entitled to that information to the extent that it

23  happened prior at John F. Kennedy Airport.  But we don't see

24  the relevance or any reason to require the agencies to do such

25  a broad search in this case.

1        THE COURT:  I don't know enough about the

2   organization but are you saying it's only JFK?  I mean well,

3   the two -- well, I'm just trying to think about this.  What

4   does the ICE NY ERO office cover?  I'm just trying to think

5   were there other international flights landing.  So it would

6   be Newark.  Is there a New Jersey office for that?  And then

7   there would be at least Stuart receives international flights.

8   So are you saying just JFK?

9        MS. OLDS:  Yes.  That's where this incident

10  happened.  It happened at JFK and --

11       MR. HANDEYSIDE:  Your Honor, if I may, there's

12  simply no basis for unilaterally restricting their search to

13  one geographic area when the allegations in this complaint are

14  plainly not restricted in scope to that geographic area.  I

15  mean as a practical matter, plaintiffs do not, and physically

16  cannot, fly only into New York.  I mean the allegations in the

17  complaint clearly pertain to a policy or practice that exists

18  beyond this region.  I mean the CBP spokespeople referred to

19  this practice being authorized and that was not a statement or

20  a position that was in any way restricted only to New York.

21  Beyond that we're not just talking about the APA here.  We're

22  talking about the Fourth Amendment as well.  To the extent

23  that standing is at issue vis-à-vis either claims, the

24  existence or nonexistence of a policy or regular practice is

25  going to be highly relevant.  To the extent there's any

17

1    burden, the need certainly outweighs any burden.  Talking

2    about policy documents --

3              THE COURT:  I'm trying to get a -- what are we

4    talking about?  So at least I understand what defendant's

5    counsel has said, she's proposing that we look at the policies

6    applicable to CBP at JFK and then the ICE office associated

7    with that which would presumably cover -- national policies

8    would apply to that office.

9              MS. OLDS:  Correct, Your Honor.

10             THE COURT:  So you're basically getting essentially

11   going up the chain of command as governing that.  That's not

12   the right phrase.  So you would capture national policy.  It's

13   just you would, at least under defendant's view, how that

14   national policy is implemented in some other airport is not

15   the issue.

16             MS. OLDS:  Correct, Your Honor.  I believe ICE has

17   126 offices and 22 regional offices and that's just really no

18   reason to subject the Government to such a burdensome search

19   when in this case the allegation is one incident that occurred

20   at JFK.  And as Your Honor pointed out, we were not objecting

21   to the request for national policies.  As JFK, particularly

22   with respect to CBP, is one of the largest international ports

23   in the country.  The international policies would be at JFK

24   and would be implemented there.  So we certainly think that

25   that search is sufficient for this case.

1          MR. HANDEYSIDE:  To the extent that we can be

2   assured that any applicable national policies could be

3   captured through a search of the New York offices, that would

4   go to the policy question.  But it wouldn't go to the regular

5   practice question and that's equally --

6          THE COURT:  Let's finish the first one.  So for now

7   are you limiting your request to all applicable policies or --

8   no, all policies.  What's the right phrasing?  To all policies

9   relevant to the issues raised in the complaint that cover CBP

10  JFK and ICE New York?  So I'm trying to cover maybe there was

11  a policy and they didn't adhere to it, you know, because they

12  did the wrong thing.  So yes, you would capture national,

13  regional, local office, airport specific policies.

14         MS. OLDS:  Correct.  They would be at JFK, CBP JFK.

15  So that's why the search is there.

16         MR. HANDEYSIDE:  I think the concern is that we need

17  to be able to access the policies to which the plaintiffs

18  would reasonably be exposed.  That's the legal question at

19  hand.  So again, the problem is that they're not only flying

20  to New York.  These are -- to the extent these are national

21  policies and they're uniform in their application, perhaps.

22  But we just don't know that.  So these plaintiffs fly all over

23  the country domestically.  To the extent they're going to be

24  exposed to the policy at issue, again, that's a legal issue

25  that's determinative here, we need to be assured that we can

1   access those policies.  So we don't know how the policies are

2   maintained but certainly we didn't think that a unilateral

3   limitation to the New York area was reasonable absent some

4   sort of assurance that whatever we would be getting would be

5   the policies to which they'll be exposed.

6           MS. OLDS:  Again, Your Honor --

7           THE COURT:  Let me just -- so I understand what

8   you're saying.  You have your other discussion about whether

9   plaintiff's future domestic travel should be known to the

10  Government.  Hypothetically, you say our clients are flying to

11  Chicago and Dallas.  Are you saying by virtue of that you're

12  now entitled to locality specific policies at those two

13  locations?

14          MR. HANDEYSIDE:  To the extent that a national

15  policy is interpreted or applied differently according to

16  field office, that's relevant.  And it's relevant because to

17  the extent that our plaintiffs are going to continue to fly to

18  these locations, if they can expect treatment that is dictated

19  by location, it's relevant to the claims.

20          MS. OLDS:  Your Honor --

21          THE COURT:  All right.  So you're not going to get

22  that.  Right now this case is about this event that happened

23  in New York and there's no information here about their

24  particular flights elsewhere or enough information to say that

25  you can reasonably anticipate that at some other location that

1  this would happen.  It's not to say the information might not

2  develop that that thesis could be put forward.  But given what

3  the complaint specifically is about that you would expect that

4  the defendants are looking for information, policies that

5  cover the events at JFK, I'm not saying -- I don't know

6  whether they're all at, physically located at JFK or JFK

7  computers or their other federal building.  I don't know where

8  you have information that governs CBP and ICE.  But you do

9  have to produce the policies relevant to the actions

10 challenged and applied to these events that the plaintiffs

11 experienced that are at every level.  So whatever the national

12 policy is, if there's a regional policy, if there is a New

13 York policy, if there is a JFK specific policy, you need to

14 produce those.  If there are -- I guess New York is probably

15 the best at least place to start.  The only other airport that

16 I think might be in the New York office that accepts

17 international flights is Stuart.  There might be others.  If

18 there are variations on the policies that apply to JFK, you

19 could produce those.  But I don't -- otherwise I don't know if

20 there's any other airport.  I think that the lack of

21 information about the broad scope of this alleged policy

22 combined with what seems to be quite a burdensome search given

23 the number of offices that this discovery is unnecessary at

24 this point.  If you learn information that changes how one

25 looks at this, you can raise the issue at a later date.  But

1  for now, focus on New York and the relevant policies of the

2  chain.

3          And then the other issue is what is it exactly

4  you're looking for?  This is the plaintiffs.  You're saying

5  other instances where CBP and ICE sought to identify and/or

6  seize identification from passengers disembarking from US

7  domestic flights.  So both the broad geographic span of that

8  as well as what exactly are you looking for?  Because as

9  defendant's counsel raised, one would expect that a normal

10  course of business not similar to your clients there would be

11  some CBP, ICE request made of passages.  For example, what the

12  defendant's counsel described.

13          MR. HANDEYSIDE:  I'm not sure I understand what --

14          THE COURT:  So your suggestion was ICE -- some

15  people who ICE -- who are different from the plaintiffs who

16  ICE is entitled to seize, take into custody for a warrant,

17  some sort of detainer order, et cetera, that there is no legal

18  opposition to that happening.  And in order to make sure they

19  have the right person, ICE may ask, or CBP might ask the

20  passenger for identification.  That's potentially a different

21  group from the plaintiffs who are making this complaint.

22          MS. OLDS:  That's correct, Your Honor.  It's very

23  different.  The claim that they're making is that everyone on

24  the plane, that their identification was required.

25          THE COURT:  Right.  So it wasn't a specific search,

22

1   you know, we're looking for Jane Doe number 10.  You know, she

2   has this physical appearance and we have reason to believe she

3   was on this flight and we go to the flight or we go to the

4   gate and we believe this is Jane Doe 10 but in order to avoid

5   accidentally picking up someone who's not the subject of a

6   detainer or a warrant or something else, some other lawful

7   legal process, we're going to ask for identification.  That's

8   not in this case.  I would expect that the other happens

9   moderately regularly.

10          MS. OLDS:  Correct, Your Honor.

11          THE COURT:  Especially at international ports of

12   entry, so --

13          MR. HANDEYSIDE:  Again, we're --

14          THE COURT:  I know your focus is on domestic

15   flights.

16          MR. HANDEYSIDE:  The request focused on domestic

17   flights and it specifically asks for instances which CBP or

18   ICE asked all or virtually all passengers for their

19   identification.  So it's very factually grounded in the

20   circumstances that gave rise to this lawsuit.  And again, it

21   goes to the question of the regular practice that --

22          THE COURT:  How would they know it?  Do you have any

23   idea of the recordkeeping about them?  It's a little bit at

24   odds here because you disagree as to whether this happens, how

25   it happens, you know, should there be particular records about

23

1  it.  But what would they be looking for?

2       MR. HANDEYSIDE:  They would know best.  Obviously,

3  we're not familiar with the recordkeeping systems.  However,

4  the individual officers here who are at issue reference the

5  fact that they do this from time to time.  Defendant Russo

6  mentioned this is something that happens regularly.  So this

7  is not something that we're casting about randomly for.  I

8  mean we're basing this on the specific allegations in the

9  complaint.  And because they came from the defendants

10  themselves, we think that those allegations are plausible and

11  a valid basis for discovery.

12       THE COURT:  All right.  So I'm going to deny the

13  request now.  Think again.  You need to develop the factual

14  basis for the request.  And particularly have some

15  understanding of logistically what's involved.  So it may be

16  in the course of your discovery you have requests with regard

17  to recordkeeping.  It may be you have a 30(b)(6) witness with

18  regard to recordkeeping.  You know, one could imagine that

19  maybe if this really happened or if this happens regularly,

20  it's something that's on a report.  You hit a button somewhere

21  and you can get all of these statistics, the numbers, the

22  reports, whatever it is.  You could also imagine, which is not

23  going to happen, that you interview every CBP officer in the

24  United States and find out how it is, right?  Goes from

25  completely impossible to be done to there's a computer system

24

1    that keeps records.  I have no idea what the situation is
2    here.  It doesn't sound like you all do.  So you need to get a
3    handle on whether this would be burdensome, practical,
4    impractical, et cetera.  And then let me know.  As it stands
5    now it seems like it would be an impractical exercise.  But if
6    you have other information along the way, particularly as you
7    develop the information that you have in New York, or if you
8    have information from outside of the case that is relevant and
9    that you're producing to the defendants, you can let me know.
10   So for the requests there, they're denied without prejudice
11   subject to being renewed if you have additional information
12   that supports those requests with the point that -- and that's
13   understanding the defendants are producing information from
14   the locality up through national policies that are applied or
15   applicable to the circumstances in New York.
16            All right.  So then the other question you have
17   outstanding is the other side of this which is the plaintiff's
18   upcoming domestic flights.
19            MR. HANDEYSIDE:  Your Honor, if I could just go back
20   quickly to the third aspect of this issue was the documents
21   related to statements by CBP spokespersons indicating that the
22   identification checks were consistent with CBP policy.  So --
23            THE COURT:  It's limited to New York.
24            MR. HANDEYSIDE:  -- the first was a policy.  The
25   second was the other instances, and the third is just

1   documents related to those --

2          THE COURT:  So yes, you should produce them but it's

3   limited to New York and obviously non-privileged statements.

4   So I don't know -- I mean there's some discussion in your

5   letter about the press and your client speaking to the press.

6   I don't know who these statements were made -- I don't know

7   what it was.

8          MR. HANDEYSIDE:  It's the CBP spokespersons who are

9   not located in New York.  I assume that those are still valid

10  grounds for discovery.

11         THE COURT:  But they were talking about New York?

12         MR. HANDEYSIDE:  I mean if they are speaking from

13  CBP public affairs at headquarters, it's our view that those

14  are again valid and subject to discovery just as the national

15  policies would be.

16         THE COURT:  Well, I don't know what you're saying.

17  You're saying that the CBP spokesperson indicated that the

18  identification checks were consistent with CBP policy.  Were

19  they talking about what you're calling identification checks

20  that were made in New York or something else?

21         MR. HANDEYSIDE:  The specific identification checks

22  at issue in this lawsuit.

23         THE COURT:  Yes.  So if it's about this lawsuit, the

24  events in New York, they are made from Washington or somewhere

25  else, Manhattan rather than at the airport, yes, you should

26

1   produce them.

2          MS. OLDS:  That's fine, Your Honor.

3          THE COURT:  So back to Interrogatory Number 8.
4   What's the issue of the domestic flights?

5          MS. OLDS:  Yes, Your Honor.  The issue is that
6   defendants are requesting information about the domestic
7   flights because plaintiff's claims are the reason why they are
8   subject to this what they're claiming is a policy in the
9   future is because they fly frequently and they have plans to
10  fly in the future.  And so plaintiffs don't want to produce
11  information with respect to that, those upcoming plans.

12         MR. HANDEYSIDE:  That's not quite accurate.  We have
13  agreed to produce information, to provide interrogatory
14  responses indicating whether and how many flights for which
15  there have been reservations already made in the future.  And
16  we're willing to provide some information about the general
17  timeframe of those flights to the extent that that's helpful.
18  We don't see a need to produce the specific flight information
19  partly because it just doesn't seem to be relevant if we're
20  averring that there are flights for which there have been
21  reservations already made.  And also because of the specific
22  nature of the allegations in this lawsuit, the plaintiffs are
23  justifiably wary and fearful of flying again given the
24  possibility they could be subjected to these kinds of checks.
25  So to this point, the Government hasn't produced any sort of

1  valid justification for needing the specific flight

2  information, especially if we're willing to provide verified

3  interrogatory responses indicating that reservations have been

4  made during X week of X month.  So to us, that should be more

5  than sufficient to satisfy any need.

6         THE COURT:  You really want to open this question of

7  where they're traveling to?  Because doesn't that sure up the

8  point that shouldn't the CBP policy in the places to which the

9  plaintiffs are traveling as relevant to this case?

10        MS. OLDS:  It's not so much that we care exactly

11  where they're going.  We just kind of wanted a way to verify

12  that they actually had made these plans.  But I think for now

13  if they will produce the information that the plaintiff's

14  counsel has said, that they have actually made the

15  reservations and some sort of timeframe of when they expect to

16  travel, then at this point we'll be okay with that.  As Your

17  Honor mentioned before, to the extent that it becomes a fact

18  question later that they've actually made these reservations,

19  then we may need to raise it in the future.  But I think for

20  now we would be okay with that.

21        THE COURT:  So in terms of -- well, any other issue?

22  You worked everything else out?

23        MR. HANDEYSIDE:  We did.  The only pending issue

24  beyond that is just the status of the Government's productions

25  of documents.  We filed our -- we submitted our RPs on

1  February 5th and we'd be -- understanding the issue the

2  protective order has been outstanding, we still haven't

3  received any actual documents.  So we are concerned that

4  documents that are not subject to the protective order have

5  not been promptly produced.

6         MS. OLDS:  Your Honor, we've been doing searches to

7  make sure that we can provide a response to the documents and

8  there are some documents that we received so far we did want

9  to designate as confidential.  So that's part of why we wanted

10  to make sure the protective order was entered before producing

11  those.  But we're not intentionally causing any sort of a

12  delay.  Certainly expect to produce documents promptly.  But

13  it does take a while even searching within JFK, the number of

14  --

15         THE COURT:  Okay.  So you mentioned that you're

16  going to make the production on a rolling basis.  So when do

17  you think you'll start making it on a rolling basis?

18         MS. OLDS:  I think we can start as early as next

19  week.  We did want the protective order to be entered prior.

20  So we think that we'll submit on Friday.  We expect as soon as

21  protective order is entered to start producing documents.

22         THE COURT:  All right.  Coming your way.  Do you

23  have any idea of the size of the production?

24         MS. OLDS:  I'm not sure yet because the search is

25  not complete.  But we have some documents so far that we can

1  produce.  And so --

2          THE COURT:  And is everything you produced on paper

3  or is there e-discovery here?  Or what's going on?

4          MS. OLDS:  I don't think it's going to be possible

5  to produce everything on paper.

6          THE COURT:  I wasn't suggesting you should.  I was

7  just wondering what it was that you were producing.

8          MS. OLDS:  I think we would probably produce --

9  probably the first set would be on CDs for the plaintiffs.

10         THE COURT:  But is there the standard e-discovery

11 questions?  You know, what format, what system are you using?

12 How is it -- I mean are they coming from electronic systems or

13 are you just producing PDFs, the paper documents?  I don't

14 know what it is that you're --

15         MS. OLDS:  Oh, okay.  So some of it is PDFs, paper

16 documents, and some are documents that have been reviewed with

17 relativity.  So that's how they're being reviewed.  Some of

18 the searches are being uploaded and how we're running the

19 searches.

20         THE COURT:  So any sense of how long global

21 production will take?

22         MS. OLDS:  The one other issue that we've run into,

23 Your Honor, is a space issue with respect to actually building

24 the documents but we're taking care of that as far as moving

25 some of the searches from -- anyway, to a place where it can

1  be expedited.  It's kind of hard to say when it'll be

2  completely finished.  I can confer again with the agencies and

3  give plaintiff's counsel and update this week as to when they

4  expect it to be -- the searches to be completely finished.

5  But again, we expect to start producing documents as early as

6  next week.

7       THE COURT:  But is it three months, six months?

8  What are we thinking?  What's the --

9       MS. OLDS:  I certainly don't think it would be six

10  months or --

11       THE COURT:  I'm not suggesting six would be a good

12  answer.  I'm just trying to get an idea of what you're talking

13  about here.

14       MS. OLDS:  I'm not 100 percent sure, Your Honor.  I

15  will promptly provide an update to plaintiff's counsel.

16       THE COURT:  All right.  So in terms of depositions,

17  what are you all thinking?  How many?  Do you need to wait

18  till the paper production is done, etcetera, etcetera.

19       MR. HANDEYSIDE:  Certainly there are depositions to

20  be scheduled imminently without -- you know, setting aside the

21  paper production.  They key defendants themselves, the

22  officers, so we can proceed with scheduling those.

23       MS. OLDS:  And plaintiffs also.  There are nine of

24  them, so it'll take some time for all of them to be deposed

25  but --

1          THE COURT:  Are they in New York?  I don't remember.

2          MS. OLDS:  I don't know if they're all in New York.

3          MR. HANDEYSIDE:  Not all of them, Your Honor.

4          THE COURT:  Okay.  So in general to finish

5     discovery, how much time do you think you need?  I'm going

6     with that you can finish your production in about three

7     months, if not shorter.  So --

8          MR. HANDEYSIDE:  As soon as possible is great for

9     us.  I mean part of it will depend on the responses to the

10    document production requests and any resulting concerns about

11    withholdings.  But we had originally keyed discovery deadlines

12    off of the filing of the answer.  But we can set some specific

13    dates instead.  Plaintiffs are perfectly happy to do that.

14         MS. OLDS:  That's correct, Your Honor.  Defendant's

15    motion is still pending in front of Judge Garaufis.  It's

16    fully briefed on April 20th.

17         THE COURT:  Right.  So I expect it's going to take

18    some time to have that resolved.  So maybe depending on -- you

19    know, Judge Garaufis has a very busy calendar, so it may be

20    that you finish this discovery and convert that to a summary

21    judgment motion.  I don't know.  Depends on how things are

22    moving.  But not rushing things, how much time do you think

23    you need for the fact discovery to be completed?  So you have

24    nine depositions.  Is that what you said?

25         MS. OLDS:  Well, that's plaintiffs.

1           THE COURT:  Plaintiffs.  And then on your side?

2           MR. HANDEYSIDE:  We would -- depending on what's

3    revealed from the productions, I mean I think we would have

4    four or five to begin of the defendants themselves and then

5    reserve a certain number based on what we see from the

6    documents.  But those could probably be scheduled and

7    completed within the next couple of months.  And then leaving

8    time for additional follow-up depositions after that.  You

9    know, I hesitate to estimate but I would think that a three or

10   four month fact discovery schedule would at this point be

11   sufficient.

12           THE COURT:  I think that's probably pretty

13   unrealistic.  You're thinking the documents are starting to

14   come next week?  Doesn't seem like it's, at least as things

15   stand now, terribly document intensive but I don't see the

16   production, even on the scant information I have here, being

17   finished short of three months.  I don't know.  Because you're

18   going to have this production next week.  You're going to

19   finish the defendants, if you're going to finish it, defendant

20   was to finish it in that month and you review it and respond

21   and wherever you all get on that.  So six months doable here?

22   You're looking at 15 to 20 depositions.  That's what I'm

23   hearing anyway.

24           MR. HANDEYSIDE:  And I don't think the depositions,

25   especially the plaintiff's, would be particularly long.  You

1  know, so we're not talking about one day each.  I mean I can't

2  speak for the Government, but there's only so much you can

3  ask.  So I mean we're happy with an aggressive schedule.

4  Perhaps we'll shoot for the end of September.

5          THE COURT:  For the Government?

6          MS. OLDS:  I mean I agree with Your Honor that

7  that's pretty ambitious and we're not sure that we can get to

8  multiple plaintiffs and complete multiple plaintiffs within

9  one day.  And we're not sure of --

10          THE COURT:  I'm going to put it down for -- that

11  you're going to finish fact discovery at the end of October.

12  It's a bit of a moving target.  I don't know how much you're

13  going to agree or not agree.  I'm impressed that you were able

14  to work out so many issues so that bodes well for getting this

15  done.  But I think it's going to take some coordination.  So

16  let me ask are there going to be experts?

17          MR. HANDEYSIDE:  We don't know yet.

18          MS. OLDS:  Well, we'll see if they try to designate

19  any.  I'm not sure why there would be any in this case.

20  Doesn't seem like that kind of case for APA review.

21          THE COURT:  All right.  So I'm going to put the

22  expert disclosures.  It should be served by October 1st.  That

23  would be whoever is the moving expert, which seems like it's

24  with the plaintiff if that's what you're doing.  Let's have a

25  status conference in early September.  How is September 6th, 10

1  o'clock?

2           MS. OLDS:  That's fine, Your Honor.

3           MR. HANDEYSIDE:  Same.

4           THE COURT:  So if you have issues along the way,

5  maybe you will after you have a chance to look at the

6  documents, or maybe you can just raise it by a joint letter.

7  And I don't know what a settlement in this case would look

8  like but is there any possibility?  I mean we're really coming

9  at it from different perspectives but --

10          MR. HANDEYSIDE:  Things are always --

11          THE COURT:  I mean now I'm just musing.  You know?

12  If the defendant's view is there is no policy, maybe all I

13  need is an affirmation of that policy.  I don't know.

14          MS. OLDS:  I think we discussed this last time.

15  We're open to whatever plaintiffs, if they have some sort of a

16  demand in mind, we're certainly open to hearing it because it

17  may be that it's possible depending on what that is.  So I

18  think they were going to get back to us on what they're

19  looking for as far as settlement.  We haven't heard anything

20  yet.

21          THE COURT:  Thoughts from the plaintiff?

22          MR. HANDEYSIDE:  We're certainly open to discussing

23  -- you know, given the posture of the proceedings at this

24  point, what's in our prayer for relief would be generally sort

25  of outlines of what we're looking for but we can discuss the

35

1   form of that and we're certainly happy to engage in

2   discussions.

3            THE COURT:  How would you see this?  On plaintiff's

4   best day, what does this look like?  You get an injunction,

5   nationwide injunction?  I don't know.  An acknowledgment that

6   there is a policy?  I don't know.  What is the --

7            MR. HANDEYSIDE:  Well, the existence of the policy

8   tends to go to standing.  Really what we're looking for is a

9   declaration and an injunction preventing suspicionless

10  searches of passengers disembarking domestic flights.  It's

11  really what the Fourth Amendment requires what we're looking

12  for.  So to the extent there's an acknowledgment that absent

13  any suspicion it's not lawful to simply require disembarking

14  passengers to disclose their identification documents, to

15  force them to do so.  That acknowledgment could form the basis

16  for some kind of settlement discussion.

17           THE COURT:  So is the defendant's view -- do you

18  agree with that standard or do you say there's no policy

19  otherwise?  It's not exactly the same thing.

20           MS. OLDS:  Well, we say there is no policy otherwise

21  but also that my concern is I can foresee certain emergency

22  situations concerning flight where an injunction like that

23  would really put law enforcement agencies in a very difficult

24  position.

25           MR. HANDEYSIDE:  Again, the Fourth Amendment guides

1    us here.  You know, the exigency can provide the outlet that

2    they're looking for.  But again, absent that and the

3    circumstances that would justify it, this is a straight up

4    Fourth Amendment violation.  So to the extent that there's a

5    possibility of agreement on that aspect of it, acknowledging

6    that the Fourth Amendment is not a rigid inflexible principle,

7    what we're looking for is the acknowledgment that this was

8    unlawful and to do so similarly in the future will be

9    unlawful.

10           THE COURT:  I guess the vexing word in there is

11   going to be similarly, what makes it similar or not.  All

12   right.  Well, what do you think could move settlement forward?

13   You have some idea about a model settlement proposal at least

14   to get the conversation rolling.  I mean it may be you're just

15   -- your view of the facts is so different.  But on the other

16   hand, if your view is yeah we all agree the Fourth Amendment

17   applies and these would be some of the contours in this

18   setting, maybe you can come to an agreement.

19           MS. OLDS:  We're certainly open to discussing it,

20   Your Honor.  We definitely are.

21           THE COURT:  And then, no disrespect to you, but if

22   this -- how does this happen given what the plaintiffs are

23   proposing is a nationwide agreement?  Does this mean justice?

24   It starts with you and it goes, you know --

25           MS. OLDS:  I don't know that we could --

1          THE COURT:  Because it seems this is broader than

2   just, at least from plaintiff's perspective, this is broader

3   than the eastern district.

4          MS. OLDS:  I'm not sure we could agree to a

5   nationwide -- I don't think that we would be able to agree to

6   that for some of the reasons that Your Honor mentioned before

7   with respect to the role of law enforcement.  We would agree

8   that the Fourth Amendment applies everywhere.  I think that we

9   already -- both sides already agree on that.  I mean it would

10  depend on the wording, but you're right.  It would be above me

11  sitting in this chair.  That's certainly true as with any

12  settlement.

13         THE COURT:  Do you have some model that you, you

14  know, on your best day what this injunction would look like?

15  It would seem like a helpful starting point.

16         MS. OLDS:  I don't know that we would agree to an

17  injunction.  I mean plaintiff mentioned that --

18         THE COURT:  No, I don't know what you'd agree to.

19  I'm saying plaintiff -- you plaintiffs have a view as to what

20  the outcome of the case should be.  So maybe an articulated

21  version of that would give you the starting point for a

22  discussion.

23         MS. OLDS:  Oh, if plaintiffs were to submit one to

24  us?

25         THE COURT:  Yes.

1          MS. OLDS:  Sure.

2          THE COURT:  To give it to you as a starting point.

3          MR. HANDEYSIDE:  We can --

4          THE COURT:  I don't know if you have another idea.

5   I mean --

6          MR. HANDEYSIDE:  No, I think that we'd certainly

7   have to sketch that out and provide it as a starting point to

8   the Government.

9          THE COURT:  When do you think you could start that?

10         MR. HANDEYSIDE:  I think we could try to have

11  something within a week as an initial starting point.

12         THE COURT:  So by the 8th.  All right.  Other issues?

13         MS. OLDS:  None right now, Your Honor, from the

14  Government.

15         THE COURT:  For plaintiffs?

16         MR. HANDEYSIDE:  None for plaintiffs.

17         THE COURT:  All right.  Thank you.

18         MR. HANDEYSIDE:  Thank you.

19         MS. OLDS:  Thank you.

20         THE COURT:  Thanks for accommodating the time change

21  again.

22         MR. HANDEYSIDE:  No problem.

23         MS. OLDS:  No problem.

24  (Proceedings concluded at 12:40 p.m.)

25                      *  *  *  *  *  *

39

1    I certify that the foregoing is a court transcript from

2 an electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                                      *Mary Greco*

6                                     Mary Greco

7 Dated:  June 21, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25