1  CONFIDENTIAL - F. RUSSO
2  UNITED STATES DISTRICT COURT
3  EASTERN DISTRICT OF NEW YORK
---------------------------------x
4  KELLEY AMADEI, et al.,
5         Plaintiffs,
                                    Civil No. 17 Civ.
6      vs.                          (NGG)(VMS)
7  KIRSTJEN NIELSEN, et al.,
8         Defendant.
---------------------------------x
9
10       * * *CONFIDENTIAL* * *
11  VIDEOTAPED DEPOSITION OF FRANCIS J. RUSSO
12         New York, New York
13         August 30, 2018
14
15
16
17
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 146015

1  CONFIDENTIAL - F. RUSSO
2  flight?
3      A.    It's not --
4            MS. OLDS:  Objection.
5            You can answer.
6      A.    It's not standard procedure.  We don't
7  have a procedure when it comes to domestic
8  passengers.
9      Q.    What about with respect to any flight,
10 whether domestic or international; was it
11 standard procedure to search -- to check the
12 identification of all the passengers on the
13 flight to identify a passenger?
14           MS. OLDS:  Objection.  He answered
15     already with respect to domestic.
16           You can answer.
17     A.    With respect to international flights,
18 we have a process and protocols in place for how
19 we identify passengers.
20     Q.    And that includes checking the
21 identification of those passengers?
22     A.    Yes, we have a procedure in place that
23 we utilize to identify passengers.
24     Q.    Okay.  So we may come back to that
25 later.

1  CONFIDENTIAL - F. RUSSO
2  issued by the New York Field Office, do they
3  have those -- the same restrictions, that they
4  need to be not in conflict with headquarters'
5  policies; is that right?
6      A.   Yes.
7      Q.   And do they also need to be not in
8  conflict with other policies at other Field
9  Offices?
10     A.   Generally, yes, most -- the Field
11 Offices know that they should be consistent with
12 each other.
13     Q.   And are you aware of any instances in
14 which a New York Field Office policy was
15 inconsistent with another Field Office policy?
16     A.   I don't recall any at this time.
17     Q.   And what about headquarters, are there
18 any restrictions on the policies that
19 headquarters can issue?
20     A.   I'm not sure because I don't work
21 there, but, you know, generally, they -- they
22 would issue policy that is consistent with what
23 the department is asking for as well.
24     Q.   And as far as you're aware, there's no
25 policy at headquarters that deals with

Page 134

1      CONFIDENTIAL - F. RUSSO
2  identification checks of domestic passengers?
3      A.    There is no policy.
4      Q.    And there's no policy at the New York
5  Field Office relating to checks of --
6  identification checks of domestic passengers?
7      A.    There is no policy.
8      Q.    And there is no policy at the JFK Port
9  of Entry relating to identification checks of
10 domestic passengers?
11     A.    There is not.
12     Q.    And are you aware of any policy
13 relating to identification checks of domestic
14 air passengers anywhere at CBP?
15     A.    I am not aware of any policy of
16 domestic checks.
17     Q.    Again, I want to make sure my question
18 is clear that it relates to policies pertaining
19 to identification checks of CB -- of passengers
20 on domestic flights?
21     A.    There is -- yeah, there is no policy
22 of identification checks of passengers on
23 domestic flights.
24     Q.    My question is not whether there's a
25 policy requiring --

Page 135

1              CONFIDENTIAL - F. RUSSO
2        A.    Right.
3        Q.    -- identification checks.
4        A.    Uh-huh.
5        Q.    Is there a policy anywhere at CBP that
6   you're aware of that relates to the procedures
7   by which officers must follow when they are
8   checking the identification of passengers on
9   domestic flights?
10       A.    No, there is not.
11       Q.    CBP also has standard operating
12  procedures?
13       A.    Yes.
14       Q.    Sometimes they're called SOPs?
15       A.    Yes.
16       Q.    Who issues standard operating
17  procedures at CBP?
18       A.    Could be headquarters or the Field
19  Office or the port.
20       Q.    So no other entity other than those
21  three within the JFK chain of command?
22       A.    I can't think of any right now.
23       Q.    And so, in order to issue a standard
24  praying procedure, what's the process that has
25  to take place?

1      CONFIDENTIAL - F. RUSSO

2   that sentence, because he -- he mentioned

3   international as well.  So that sentence was not

4   accurate.

5           So because of that and because of the

6   fact that I just felt the rest of his e-mail

7   implied that there was no SOP, there was no

8   reason to say it.

9       Q.   So, just so I understand, is it your

10  testimony that there is in fact an SOP that is

11  followed regarding the identification of

12  arriving passengers traveling internationally?

13      A.   Correct.

14      Q.   And there is not an SOP that is

15  followed regarding the identification of

16  arriving passengers traveling domestically?

17      A.   Correct.  We don't have a policy for

18  domestic passengers because we don't identify

19  passengers domestically.

20      Q.   And you also don't have an SOP

21  regarding domestic passengers?

22      A.   Correct.

23      Q.   Then you next say, "The rest of it is

24  good and basically outlines our policy."

25           What did you mean by that?

Page 233

1  CONFIDENTIAL - F. RUSSO
2  Q.   So, in connection with the incident,
3  you had an e-mail exchange with Jordan Wells; is
4  that right?
5  A.   Yes.
6  Q.   And he's an attorney with the New York
7  Civil Liberties Union?
8  A.   Yes.
9  Q.   Is this -- the e-mail at CBP 706, have
10 you seen that before?
11 A.   I have.
12 Q.   Is that your e-mail communication with
13 Mr. Wells on February 23?
14 A.   It is.
15 Q.   I'd like you to turn to page CBP 707,
16 and in the middle of the page, there's an e-mail
17 from you on February 23 at 12:21.
18      Do you see that?
19 A.   I do.
20 Q.   And you write to Mr. Wells and say,
21 "Jordan, I'm not available for a call right now,
22 but I can assure you that the story has nothing
23 to do with anything you might be thinking.  We
24 were simply assisting our sister agency in
25 tracking down one individual.  Unfortunately,

Page 234

1        CONFIDENTIAL - F. RUSSO
2   the story is being sensationalized and people
3   are jumping to unnecessary conclusions."
4            What were the unnecessary conclusions
5   that you were talking about in this e-mail?
6       A.   This occurrence was on the heels of
7   the executive order and a new administration,
8   and some of the commentary indicated that this
9   must be new orders from the new administration.
10      Q.   But that was not the case?
11      A.   It was not the case.
12      Q.   If you go to page 706, at the very top
13  of the page, there's an e-mail from you on
14  February 23 at 3:33 p.m.
15           Do you see that?
16      A.   I do.
17      Q.   You -- this is you writing to Mr.
18  Wells.  You say, "Jordan - We do this every day.
19  Someone took a picture and put it on Twitter.
20  That's what led to the hysteria."
21           What did you mean "we do this every
22  day"?
23      A.   So I was responding specifically to
24  the last part of his comment underneath where he
25  says, you know, "many, many everyday people with

1   CONFIDENTIAL - F. RUSSO
2   prior removal orders."  There are many, many
3   everyday people with prior removal orders, and
4   with respect to that, we, every day, are
5   involved in refusing entry to individuals on the
6   international side, and so that's something that
7   happens every day.  Beyond that, I was also
8   referring to the fact that we help our partners
9   every day.
10              So just trying to -- to make him
11  understand that this was not something -- this
12  was not part of something resulting from the new
13  administration.  This is what we do every day,
14  help our partners and get involved in people who
15  we refuse entry into the United States.
16       Q.   So is there anything else that you
17  were referring to other than, when you said "we
18  do this every day," other than dealing with
19  folks subject to removal orders and helping
20  partners?
21       A.   No.
22       Q.   So is part of helping partners
23  sometimes identifying a person of interest on a
24  flight?
25       A.   Not so much identifying, but