Page 1

1            CONFIDENTIAL - F. RUSSO
2        UNITED STATES DISTRICT COURT
3        EASTERN DISTRICT OF NEW YORK
    ------------------------------x
4 KELLEY AMADEI, et al.,
5         Plaintiffs,
                    Civil No. 17 Civ.
6     vs.            (NGG)(VMS)
7 KIRSTJEN NIELSEN, et al.,
8         Defendant.
    ------------------------------x
9
10       * * *CONFIDENTIAL* * *
11   VIDEOTAPED DEPOSITION OF FRANCIS J. RUSSO
12         New York, New York
13         August 30, 2018
14
15
16
17
18
19
20
21
22
23 Reported by:
24 KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25 JOB NO. 146015

1         CONFIDENTIAL - F. RUSSO

2  exactly what she's thinking, but based on the
3  concerns that we were getting, I imagine that
4  she was not aware at the time of everything that
5  was going on.
6         So, on the surface, us just checking
7  IDs of individuals on a flight could have been a
8  concern without knowing the rest of the story.
9     Q.   And why is that?  Why would that be a
10 concern?
11        MS. OLDS:  Objection.
12        You can answer.
13    A.   Because we -- we don't normally do
14 that.  We don't normally check IDs on a domestic
15 flight.
16    Q.   And why don't you normally check IDs
17 on a domestic flight?
18    A.   We -- we have enough work on the
19 international side.  It's not something that we
20 do on any kind of a basis.
21    Q.   Is there any sort of legal prohibition
22 on you checking identification on a domestic
23 flight?
24        MS. OLDS:  Objection.
25    A.   We don't check domestic flights, and

1   CONFIDENTIAL - F. RUSSO
2   so I wouldn't know what the legal, you know,
3   basis would be because we don't do it. So I
4   wouldn't recall if there is a legal basis.
5       Q.   So you have no basis to know whether
6   it's lawful or not to check identification on a
7   domestic flight?
8           MS. OLDS: Objection.
9       A.   No, because we -- we don't check
10  domestic flights, so it's not something that we
11  would normally know. If -- if we had a question
12  about it, we might check with counsel.
13      Q.   But you didn't do that in this case?
14      A.   No, not because of the time.
15      Q.   But since then, have you done that?
16      A.   No; and not also because we had no
17  intention of checking IDs on that flight. The
18  intention was to just find this one individual.
19  We were expecting him to identify himself to the
20  crew, and then that would have been the end of
21  it.
22          If he would have been the first person
23  off that flight and we would have identified him
24  as the person on that flight, we wouldn't have
25  checked any more IDs on that flight.

1   CONFIDENTIAL - F. RUSSO
2   issued by the New York Field Office, do they
3   have those -- the same restrictions, that they
4   need to be not in conflict with headquarters'
5   policies; is that right?
6       A.   Yes.
7       Q.   And do they also need to be not in
8   conflict with other policies at other Field
9   Offices?
10      A.   Generally, yes, most -- the Field
11  Offices know that they should be consistent with
12  each other.
13      Q.   And are you aware of any instances in
14  which a New York Field Office policy was
15  inconsistent with another Field Office policy?
16      A.   I don't recall any at this time.
17      Q.   And what about headquarters, are there
18  any restrictions on the policies that
19  headquarters can issue?
20      A.   I'm not sure because I don't work
21  there, but, you know, generally, they -- they
22  would issue policy that is consistent with what
23  the department is asking for as well.
24      Q.   And as far as you're aware, there's no
25  policy at headquarters that deals with

1         CONFIDENTIAL - F. RUSSO
2    identification checks of domestic passengers?
3         A.    There is no policy.
4         Q.    And there's no policy at the New York
5    Field Office relating to checks of --
6    identification checks of domestic passengers?
7         A.    There is no policy.
8         Q.    And there is no policy at the JFK Port
9    of Entry relating to identification checks of
10   domestic passengers?
11        A.    There is not.
12        Q.    And are you aware of any policy
13   relating to identification checks of domestic
14   air passengers anywhere at CBP?
15        A.    I am not aware of any policy of
16   domestic checks.
17        Q.    Again, I want to make sure my question
18   is clear that it relates to policies pertaining
19   to identification checks of CB -- of passengers
20   on domestic flights?
21        A.    There is -- yeah, there is no policy
22   of identification checks of passengers on
23   domestic flights.
24        Q.    My question is not whether there's a
25   policy requiring --

Page 135

1           CONFIDENTIAL - F. RUSSO
2       A.    Right.
3       Q.    -- identification checks.
4       A.    Uh-huh.
5       Q.    Is there a policy anywhere at CBP that
6  you're aware of that relates to the procedures
7  by which officers must follow when they are
8  checking the identification of passengers on
9  domestic flights?
10      A.    No, there is not.
11      Q.    CBP also has standard operating
12 procedures?
13      A.    Yes.
14      Q.    Sometimes they're called SOPs?
15      A.    Yes.
16      Q.    Who issues standard operating
17 procedures at CBP?
18      A.    Could be headquarters or the Field
19 Office or the port.
20      Q.    So no other entity other than those
21 three within the JFK chain of command?
22      A.    I can't think of any right now.
23      Q.    And so, in order to issue a standard
24 praying procedure, what's the process that has
25 to take place?

Page 210

CONFIDENTIAL - F. RUSSO

2 that sentence, because he -- he mentioned
3 international as well. So that sentence was not
4 accurate.
5 So because of that and because of the
6 fact that I just felt the rest of his e-mail
7 implied that there was no SOP, there was no
8 reason to say it.
9 Q. So, just so I understand, is it your
10 testimony that there is in fact an SOP that is
11 followed regarding the identification of
12 arriving passengers traveling internationally?
13 A. Correct.
14 Q. And there is not an SOP that is
15 followed regarding the identification of
16 arriving passengers traveling domestically?
17 A. Correct. We don't have a policy for
18 domestic passengers because we don't identify
19 passengers domestically.
20 Q. And you also don't have an SOP
21 regarding domestic passengers?
22 A. Correct.
23 Q. Then you next say, "The rest of it is
24 good and basically outlines our policy."
25 What did you mean by that?

Page 233

1    CONFIDENTIAL - F. RUSSO
2    Q.  So, in connection with the incident,
3    you had an e-mail exchange with Jordan Wells; is
4    that right?
5    A.  Yes.
6    Q.  And he's an attorney with the New York
7    Civil Liberties Union?
8    A.  Yes.
9    Q.  Is this -- the e-mail at CBP 706, have
10   you seen that before?
11   A.  I have.
12   Q.  Is that your e-mail communication with
13   Mr. Wells on February 23?
14   A.  It is.
15   Q.  I'd like you to turn to page CBP 707,
16   and in the middle of the page, there's an e-mail
17   from you on February 23 at 12:21.
18       Do you see that?
19   A.  I do.
20   Q.  And you write to Mr. Wells and say,
21   "Jordan, I'm not available for a call right now,
22   but I can assure you that the story has nothing
23   to do with anything you might be thinking.  We
24   were simply assisting our sister agency in
25   tracking down one individual.  Unfortunately,

```
 1              CONFIDENTIAL - F. RUSSO
 2   the story is being sensationalized and people
 3   are jumping to unnecessary conclusions."
 4              What were the unnecessary conclusions
 5   that you were talking about in this e-mail?
 6       A.     This occurrence was on the heels of
 7   the executive order and a new administration,
 8   and some of the commentary indicated that this
 9   must be new orders from the new administration.
10       Q.     But that was not the case?
11       A.     It was not the case.
12       Q.     If you go to page 706, at the very top
13   of the page, there's an e-mail from you on
14   February 23 at 3:33 p.m.
15              Do you see that?
16       A.     I do.
17       Q.     You -- this is you writing to Mr.
18   Wells.  You say, "Jordan - We do this every day.
19   Someone took a picture and put it on Twitter.
20   That's what led to the hysteria."
21              What did you mean "we do this every
22   day"?
23       A.     So I was responding specifically to
24   the last part of his comment underneath where he
25   says, you know, "many, many everyday people with
```

Page 235

1  CONFIDENTIAL - F. RUSSO
2  prior removal orders." There are many, many
3  everyday people with prior removal orders, and
4  with respect to that, we, every day, are
5  involved in refusing entry to individuals on the
6  international side, and so that's something that
7  happens every day. Beyond that, I was also
8  referring to the fact that we help our partners
9  every day.
10          So just trying to -- to make him
11  understand that this was not something -- this
12  was not part of something resulting from the new
13  administration. This is what we do every day,
14  help our partners and get involved in people who
15  we refuse entry into the United States.
16     Q.   So is there anything else that you
17  were referring to other than, when you said "we
18  do this every day," other than dealing with
19  folks subject to removal orders and helping
20  partners?
21     A.   No.
22     Q.   So is part of helping partners
23  sometimes identifying a person of interest on a
24  flight?
25     A.   Not so much identifying, but