UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
KELLEY AMADEI, CAROLA CASSARO, LAURA
CUCULLU, COREY FIELDS, ANNE GARRETT, AMY
LANIGAN, MATT O'ROURKE, ERIC POLK, and
KAREN POLK,

                         Plaintiffs,

         -against-

KIRSTJEN M. NIELSEN, KEVIN K. MCALEENAN,
LEON HAYWARD, FRANCIS J. RUSSO,
RONALD D. VITIELLO, THOMAS DECKER,
DAVID JENNINGS, and, JOHN DOES 1
AND 2,

                         Defendants.
----------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-5967 (NGG) (VMS)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs Kelley Amadei, Carola Cassaro, Laura Cucullu, Corey Fields, Anne Garrett,

Amy Lanigan, Matt O'Rourke, Eric Polk, and Karen Polk bring this action requesting

declaratory and injunctive relief pursuant to § 702 of the Administrative Procedure Act ("APA"),

5 U.S.C. § 706(2), and the Fourth Amendment to the United States Constitution against

Defendants Kirstjen M. Nielsen, Kevin K. McAleenan, Leon Hayward, Francis J. Russo, Ronald

D. Vitiello, Thomas Decker, David Jennings, and Defendant Doe Officers 1 and 2 (collectively,

"Defendants").[1] (Compl. (Dkt. 1).)

      Before the court is Defendants' motion to dismiss Plaintiffs' complaint pursuant to

Federal Rule of Civil Procedure 12(b)(1) and (6). (See Defs. Mot. to Dismiss ("Defs. Mot.")

---

[1] All Defendants are named in their official capacities: Kirstjen Nielsen is the United States Secretary of Homeland
Security; Kevin K. McAleenan is the Commissioner of U.S. Customs and Border Protection ("CBP"); Leon
Hayward is the Acting Director of New York Field Operations for CBP; Francis J. Russo is the Port Director for the
John F. Kennedy International Airport Port of Entry within CBP; Ronald D. Vitiello is the Acting Director of U.S.
Immigration and Customs Enforcement ("ICE"); Thomas Decker is the Director of ICE's New York Field Office;
David Jennings is the Director of ICE's San Francisco Field Office; and Defendants Doe 1 and Doe 2 are officers of
CBP. (Compl. ¶¶ 20-27.) See Fed. R. Civ. P. 25(d).

(Dkt. 32); Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem.") (Dkt. 32-1).) For the reasons stated below, Defendants' motion is DENIED.

## I.   BACKGROUND

### A.   Facts

#### 1.   The Search of Passengers on Delta Flight 1583

On February 22, 2017, Plaintiffs were passengers on Delta Airlines Flight 1583, a domestic flight from San Francisco International Airport to New York's John F. Kennedy International Airport ("JFK"). (Compl. ¶ 1.) Most of the Plaintiffs reside in New York. (Id. ¶¶ 11-12, 15, 17-19.) Plaintiffs are a diverse group of individuals, consisting of nine men and women of a variety of ages and races. (Id. ¶¶ 11-19, 60.) Among them are several "consultant[s]," "journalist[s]," a pair of "marketing professional[s]," and a "university professor." (Id.) Some of the Plaintiffs were traveling with family that day. For instance, Plaintiff Amadei was traveling with her spouse and seven-year-old son, and Plaintiffs Eric and Karen Polk are married. (Id. ¶ 60.) While diverse in background, Plaintiffs share two common experiences: they are "frequent passengers on domestic airline flights," and they all allege that Defendants subjected them to an unlawful search as Plaintiffs disembarked from this particular flight. (Id. ¶¶ 1, 9.)

After Plaintiffs' flight arrived at JFK, but before it parked at the gate, the flight crew announced to the passengers that as they deplaned "they would have to show documents to [CBP] officers meeting the flight." (Id. ¶ 36.) Following this initial announcement, the flight crew made "at least two announcements regarding the requirement that the passengers produce documents." (Id. ¶ 38.) A flight attendant clarified that "documents" meant a "passport or government-issued ID" and further stated that the passengers should be prepared to provide "any

additional documentation that the officers requested." (Id.) A flight attendant also told the passengers that "no passenger[] would be allowed to deplane without showing . . . identification." (Id.) At this point, many passengers and even several flight attendants "expressed consternation or dismay" and "wondered aloud about the purpose of the demand for documents, who the officers were, and why all passengers would be required to show such documents after a domestic flight." (Id. ¶¶ 37, 39.)

Following these announcements, a flight attendant opened the aircraft door located between the first class and economy cabins, which was the only exit from the aircraft. (Id. ¶ 40.) Outside the door and positioned in such a way as to block the exit were two "tall and physically imposing" Customs and Border Control ("CBP") agents, Officers John Doe 1 and John Doe 2 (the "Doe Officers"). (Id. ¶¶ 41, 43.) Both of the Doe Officers wore bulletproof vests that read "POLICE / U.S. CUSTOMS AND BORDER PROTECTION" and carried guns that were visible to the passengers onboard. (Id. ¶¶ 41-43.) As passengers approached the door, the Doe Officers permitted each passenger to exit only upon a complete and thorough review of the passenger's identification document. (Id. ¶¶ 45, 47.) Plaintiffs observed that the demeanor of the Doe Officers during this process was "stern and unfriendly." (Id. ¶ 44.)

Plaintiffs were distressed and alarmed by the situation. (Id. ¶¶ 48-50.) Plaintiff Amadei, who was traveling with her spouse and seven-year-old son (who has darker skin than she), had to explain to the Doe Officers that her son is only seven years old and does not carry identification. (Id. ¶ 48.) Plaintiff Amadei's son was noticeably frightened by this experience, at one point asking his mother if the family was in trouble. (Id.) Upon escorting her family out of the gate area, Plaintiff Amadei asked the Doe Officers why the search was happening and was told, "it's not for you to worry about; we do it from time to time," or words to that effect. (Id. ¶ 50.)

3

Plaintiffs allege that they did not consent to the identification search. (Id. ¶ 51.) Instead, they understood from the circumstances that the search was mandatory and that they would not be free to exit the aircraft until they submitted their documents to the Doe Officers. (Id.) Plaintiffs allege that CBP did not have a valid judicial warrant authorizing the alleged search and seizure of Flight 1583 passengers and further allege that CBP did not have any individualized reasonable suspicion that any passenger, "much less all passengers," had engaged in criminal activity. (Id. ¶ 54.)

2. CBP's Explanation for the Search

In response to media reports about the incident, CBP "attempted to justify its actions by asserting that the officers involved were searching for a specific person subject to removal from the United States." (Id. ¶ 56.) CBP also justified the search by saying that searches like the one that occurred on Flight 1583 are "routine," and that the officers acted "pursuant to longstanding CBP policy," citing regulations permitting searches of passengers arriving to the United States from abroad. (Id.) In a public statement released on February 23, 2017, CBP stated:

> U.S. Customs and Border Protection (CBP) at John F. Kennedy Airport was contacted by U.S. Immigration and Customs Enforcement (ICE) yesterday, February 22, 2017, to assist in locating an individual possibly aboard Delta flight 1583 from San Francisco International Airport to JFK. This individual was ordered removed by an immigration judge. To assist our law enforcement partners, two CBP officers requested identification from those on the flight in order to help identify the individual. The individual was determined not to be on the flight.
>
> CBP often receives requests from our law enforcement partners to assist in various ways, including identifying a person of interest. CBP will assist when able to.

(Id. ¶ 57.) When asked by the news media whether the search was voluntary, a spokesperson for CBP stated, "[i]t is always best to cooperate with law enforcement, so as to expedite your exiting

the airport in a timely manner." (Id. ¶ 61. (alteration in original)) CBP subsequently followed up with a statement claiming that the Doe Officers had requested "consensual assistance from passengers aboard the flight." (Id. ¶ 62.) Separately, a CBP spokesperson told a reporter that the identification checks are "not a new policy" and that it is "not unusual for us to assist our fellow law-enforcement agencies." (Id. ¶ 63.) Another Department of Homeland Security ("DHS") official told the media that such searches and collaboration between CBP and ICE are "routine." (Id. ¶ 64.)

In an email exchange regarding the search, Defendant Russo asserted that the search was undertaken at the request of ICE "to identify [an] individual" who was "removed by an immigration judge for domestic assault and other crimes." (Emails between Def. Russo and Jordan Wells ("Russo Emails") (Dkt. 1-1) at 1.) In the same exchange, Defendant Russo stated the following: "[w]e do this every day. Someone took a picture and put it on twitter. That's what led to the hysteria." (Id.) Finally, in response to a media inquiry asking that CBP identify its statutory authority to examine the identification documents of all passengers on a domestic flight, CBP sent a link to a document on the CBP website entitled "CBP Search Authority" which cites 19 C.F.R. § 162.6, a regulation governing CBP's authority to search passengers entering the United States from abroad. (Compl. ¶¶ 67-68.)

On February 27, 2017, Congressman Bennie G. Thompson, the Ranking Member of the U.S. House Committee on Homeland Security, wrote to ICE and CBP, stating that "[i]t is . . . troubling that CBP officers called to assist apparently chose to require passengers, including U.S. citizens, to produce identification before disembarking, rather than confirming whether the individual was on the flight either by visual inspection, checking the passenger manifest, or confirming with ICE that the individual was aboard." (Id. ¶ 70. (alteration in original)) Rep.

Thompson asked CBP a variety of questions to which he sought written responses by March 10, 2017. (Id.) According to Plaintiffs, as of the date of the filing of the complaint, Rep. Thompson has not yet received a response from CBP or ICE. (Id. ¶ 71.) On September 13, 2017, Plaintiffs' counsel asked Defendants Duke, McAleenan, Russo, Homan, Decker, and Jennings to clarify whether CBP has a policy that would permit the stopping and searching of passengers on domestic flights and, if so, the legal authority to justify such a policy. (Id. ¶ 72.) Plaintiffs received a letter from DHS's Office of General Counsel acknowledging receipt of the letter, but Plaintiffs have not yet received a substantive response. (Id. ¶ 73.)

### B. Procedural History

Plaintiffs filed their complaint on October 12, 2017. (Compl.) Plaintiffs bring claims based on two causes of action. First, Plaintiffs allege that their Fourth Amendment rights were violated when they were required to produce identification before exiting the aircraft.[2] (See id. ¶¶ 77-88.) Second, Plaintiffs allege that, to the extent that CBP officers acted pursuant to a policy in checking the passengers' respective identification, this policy violates § 706(2)(A)-(C) of the APA. (See id. ¶¶ 89-95.) Plaintiffs seek declaratory and injunctive relief, including a declaration that "the rule or policy pursuant to which CBP conducted the illegal search and seizure of Plaintiffs as they deplaned Flight 1583 on February 22, 2017, including, but not limited to 19 C.F.R. § 162.6, is unconstitutional, arbitrary and capricious, an abuse of discretion, contrary to law, and in excess of statutory authority, and is therefore invalid under the Administrative Procedure Act." (Compl. at p.20.) Plaintiffs also request a permanent injunction that bars Defendants and their agencies from "seizing and conducting warrantless and/or suspicionless identification checks of passengers disembarking from domestic flights." (Id.)

---

[2] Defendants do not move to dismiss Plaintiffs' Fourth Amendment claim. (See Defs. Mem.)

On February 12, 2018, the court granted Defendants leave to move to dismiss the Complaint. (Feb. 12, 2018, Min. Entry.) The motion was fully briefed on April 20, 2018. (Defs. Mot.; Defs. Mem.; Pls. Opp'n to Defs. Mot. ("Pls. Opp'n") (Dkt. 33); Defs. Reply (Dkt. 34).)[3]

## II.    LEGAL STANDARDS

### A.    12(b)(1) Standard

Pre-answer motions to dismiss for lack of standing are governed by Federal Rule of Civil Procedure 12(b)(1). See Fed. R. Civ. P. 12(b)(1) (permitting dismissal for "lack of subject-matter jurisdiction"); Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016) (noting that a plaintiff must have standing under Article III of the Constitution to invoke a federal court's subject-matter jurisdiction). As the party invoking the court's jurisdiction, Plaintiffs have the burden of proof of establishing that they have standing. Carter, 822 F.3d at 56. (quoting Lujan v. Defs of Wildlife, 504 U.S. 555, 561 (1992)).

At the pleading stage, Plaintiffs have the burden of "alleg[ing] facts that affirmatively and plausibly suggest that [they] have standing to sue." Carter, 822 F.3d at 56 (quoting Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d. Cir. 2011)). Under this standard, "general factual allegations of injury resulting from [Defendants'] conduct may suffice." Id. (quoting Lujan, 504 U.S. at 561). In cases such as this one, where a 12(b)(1) motion is based solely on the uncontroverted allegations of the complaint—a "facial" 12(b)(1) motion—the court

---

[3] On January 16, 2018, Defendants moved to stay discovery pending their anticipated motion to dismiss. (Defs. 1st Mot. to Stay Discovery (Dkt. 20).) On January 25, 2018, Judge Scanlon denied the motion to stay, though she permitted Defendants to "raise the issue with the District Judge during the [pre-motion conference]." (Jan. 25, 2018, Order (Dkt. 24) at 2.) Defendants renewed their request to stay discovery at the February 12, 2018, pre-motion conference; this court denied the motion. (Feb. 12, 2018, Min. Entry). On October 19, 2018, Defendants renewed their motion to stay discovery, pending the outcome of the motion to dismiss. (Defs. 2nd Mot. to Stay Discovery (Dkt. 61).) On October 25, 2018, Judge Scanlon denied Defendants' renewed request. (Oct. 25, 2018, Order (Dkt. 67).) On November 5, 2018, Defendants appealed Judge Scanlon's decision to this court. (Not. of Mot. (Dkt. 70).) Defendants' appeal is now deemed moot, as a result of the court's order denying Defendants' motion to dismiss.

must "accept [] as true all material [factual] allegations of the complaint and draw[] all

reasonable inferences in favor of" Plaintiffs. Id. at 57 (second alteration in original) (citation and

internal quotation marks omitted) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir.

2003)); see Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010) ("Because standing is

challenged here on the basis of the pleadings, we therefore accept as true all material allegations

of the complaint, and must construe the complaint in favor of the complaining party.")

(alterations adopted) (quoting W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP, 549 F.3d

100, 106 (2d Cir. 2008)).[4]

## B.    12(b)(6) Standard

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to

test the legal sufficiency of Plaintiffs' claims for relief. Patane v. Clark, 508 F.3d 106, 112

(2d Cir. 2007).  A complaint will survive a motion to dismiss if it contains "sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." Id.

---

[4] Defendants rely on Second Circuit decisions holding that a plaintiff must establish standing by "a preponderance of the evidence," arguing that the court cannot draw "from the pleading[] inferences favorable to" Plaintiffs. (See Defs. Mem. at 3.)  The court has examined these cases and finds that they are not controlling with respect to Defendants' facial 12(b)(1) motion.  See Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) (applying the preponderance of the evidence standard); Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) ("[J]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." (quoting APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)), aff'd on other grounds, 561 U.S. 247 (2010).  These cases are inconsistent with more recent Second Circuit case law that recognizes the standard of review as the court has explained it above. See, e.g., Carter, 822 F.3d at 56; Amidax Trading Grp., 671 F.3d at 145; Carver, 621 F.3d at 225.  Further, the Second Circuit has recently considered and declined to decide the question of whether the "plausibly allege" standard or the "preponderance of the evidence" standard serves as the exclusive burden of proof applicable to a 12(b)(1) motion. See Davis v. N.Y. State Bd. of Elections, 689 F. App'x 665, 668 (2d Cir. 2017) (summary order).  In light of this uncertainty, the court applies the more recent Second Circuit case law for the purposes of deciding Defendants' motion.

As with a facial 12(b)(1) motion, when reviewing a complaint on a motion to dismiss for failure to state a claim, the court must accept as true all allegations of fact in the complaint and draw all reasonable inferences in favor of Plaintiffs. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005). "[W]hatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007) (internal citation and quotation marks omitted). Finally, it is generally improper for the court to consider factual averments contained in affidavits on a Rule 12(b)(6) motion. See Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988).

## III. DISCUSSION

Defendants raise two arguments in their motion to dismiss. First, Defendants argue, Plaintiffs lack standing for declaratory and injunctive relief. (Defs. Mem. at 8.) Second, Defendants contend that Plaintiffs have not alleged final agency action that is reviewable under the APA. (Defs. Mem. at 5.) The court ultimately finds neither argument persuasive and addresses each argument in turn.

### A. Russo Declaration

Defendants submit a declaration from Defendant Francis Russo (the "Russo Declaration") in an attempt to controvert Plaintiffs allegations that CBP acted pursuant to an

official policy. (See Russo Emails.) Instead of asserting a facial 12(b)(1) motion, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the [p]leading." Carter, 822 F.3d at 57. If the defendant's proffered evidence "reveal[s] the existence of factual problems" in the plaintiff's assertion of jurisdiction, the plaintiff must then "come forward with evidence of their own to controvert that presented by the defendant." Id. (quoting Exch. Nat'l Bank of Chi. v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir. 1976)). "If the extrinsic evidence presented by the defendant is material controverted" by the plaintiff, then the court "will need to make findings of fact in aid of its decision as to standing." Id. A plaintiff is, however, "entitled to rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." Id.

As the court discusses in greater detail below, Plaintiffs' argument for standing to seek declaratory and injunctive relief relies in large part on Plaintiffs' allegations that the search was conducted pursuant to a formal policy and is a routine practice. (See Pls. Opp'n at 22-23.) Plaintiffs supplement these allegations by attaching as an exhibit an email exchange in which Defendant Russo claims that CBP conducts this sort of search "every day." (See Russo Emails.) For the reasons stated below, the court finds that Plaintiffs' allegations and exhibit are facially sufficient to establish that Plaintiffs have sufficiently alleged standing at this stage of the litigation.

Defendants attempt to controvert Plaintiffs' allegations by averring that Defendant Russo's emails did not "express[] . . . that there is a CBP policy or practice of checking identification of all passengers disembarking U.S. domestic flights, or all passengers disembarking a single U.S. domestic flight." (Russo Decl. ¶ 4.) Russo also claims that "[o]ther

10

than the incident" at issue in this case, he is "not aware of another incident in which CBP checked the identification of all passengers disembarking a U.S. domestic flight." (Id. ¶ 5.) Plaintiffs respond to the Russo Declaration by arguing that it presents "[c]onclusory allegations" that are "insufficient to contradict plausible allegations" in Plaintiffs' complaint. (Pls. Opp'n at 6.) The court agrees with Plaintiffs and finds that the Russo Declaration does not contradict Plaintiffs' facially plausible allegations. Defendant Russo's conclusory disclaimer of the existence of any CBP policy or practice of searching domestic airline passengers is itself plainly contradicted by the content and context of Defendant Russo's email exchange and the statements of other CBP officials in defense of the search. Cf. Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (finding "conclusory allegations in [a party's] affidavit are not sufficient to create a material issue of fact" for the purposes of a 12(b)(1) motion). The statements provided in Plaintiffs complaint acknowledged that the search was conducted pursuant to a policy or practice. (See Compl. ¶¶ 63-65, Russo Emails.) Defendant Russo's other claim, that he is not aware of any other incident similar to the one at issue in this case, is similarly contradicted on its face by Defendant Russo's own emails and Plaintiffs' voluminous and plausible allegations showing CBP officials describing the search as part of a routine practice. (See Compl. ¶¶ 63-65, Russo Emails.) The court therefore finds that Defendants' proffer of the Russo Declaration fails to support a fact-based 12(b)(1) motion and treats Defendants' motion as a facial motion.

## B. Article III Standing

Because standing concerns the court's jurisdiction, it is a "threshold question in every federal case" and "determin[es] the power of the court to entertain the suit." Davis v. Hain Celestial Grp., 297 F. Supp. 3d 327, 338 (E.D.N.Y. 2018) (quoting Warth v. Seldin, 422 U.S.

490, 498 (1975)).  Accordingly, Plaintiffs must show that they have standing before the court can

proceed to consider the merits of their claims.

The standing requirement, as governed by Article III of the Constitution, restricts federal

courts to the resolution of "Cases" and "Controversies."  Lujan, 504 U.S. at 560.  Plaintiffs are

thus required to show at the outset of the litigation that they have a sufficient personal interest in

seeking their requested relief.[5]  See Davis v. Fed. Election Comm'n, 554 U.S. 724, 732 (2008).

The "irreducible constitutional minimum of standing" contains three elements that

Plaintiffs must satisfy.  Lujan, 504 U.S. at 560.  First, Plaintiffs must show that they suffered an

"injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not

conjectural or hypothetical."  Id. (internal citation and quotation marks omitted).  Second,

Plaintiffs must show that there is a "causal connection between the injury and the conduct

complained of"—or, in other words, that Plaintiffs' injury is "fairly . . . traceable to the

challenged action of [Defendants]."  Id. (brackets omitted).  Third, Plaintiffs must show that their

alleged injury "will be redressed by a favorable decision."  Id. at 561 (internal citation and

quotation marks omitted).

The parties primarily dispute whether Plaintiffs satisfy the injury in fact element.

Defendants do not appear to dispute that Plaintiffs satisfy the causation and redressability

elements of standing.  (See Defs. Mem.)

Regarding the injury-in-fact element, Defendants argue that Plaintiffs lack standing to

seek declaratory and injunctive relief against Defendants' search policy because Plaintiffs fail to

---

[5] Since "standing is not dispensed in gross," the court must consider whether each individual plaintiff has standing.
Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996).  The court finds, however, that it is proper to consider the standing of
the Plaintiffs as whole because their claims arise from virtually the same set of allegations.  All of the Plaintiffs
allege that they are frequent domestic air travelers and were subjected to the same challenged search.  (See Compl.
¶¶ 1, 74.)  Since these are the key material allegations for the purposes of the court's standing inquiry, the court
treats as equal the standing arguments for all Plaintiffs.

show that they suffered an injury that warrants prospective relief. (See Defs. Mem. at 9-14.) Specifically, Defendants argue that Plaintiffs have not demonstrated that they are likely to experience a similar search in the future—a necessary showing for Plaintiffs to seek prospective relief—because Plaintiffs have not alleged that they have definitive plans to take a domestic flight in the future and have only been subjected to a search once before. (See id. at 9-10.) Defendants also argue that Plaintiffs cannot show that Defendants conducted the search pursuant to a formal policy, the absence of which diminishes the likelihood that Plaintiffs will experience another search in the future. (See id. at 14-15.) As a result, Defendants argue, Plaintiffs cannot show that they are sufficiently likely to suffer a similar injury in the future and thus lack standing to seek prospective relief. (See id. at 10.)

Plaintiffs respond by relying on their allegations that Defendants' search was conducted pursuant to a formal policy and is a routine practice—allegations that derive from Defendants' own statements in defense of the search. (Pls. Opp'n at 11; Compl. ¶ 64.) Plaintiffs assert that these allegations, in conjunction with their allegation that they are frequent domestic air travelers, establish that there is a sufficiently strong likelihood that Plaintiffs will experience a similar search in the future when they travel on another domestic flight. (See Pls. Opp'n at 12-13.) Plaintiffs argue that, at this early stage in the litigation, these allegations are sufficient to show that they have standing to seek prospective relief against the policy that has injured them once before. (Id.)

For the reasons stated below, the court finds that the majority of Plaintiffs have plausibly alleged that they have standing to seek declaratory and injunctive relief from Defendants' search policy.

1.    Injury in Fact

13

### a. Legal Standard

There is a "low threshold" for establishing an injury in fact. Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008). For instance, an injury in fact "need not be capable of sustaining a valid cause of action," but instead "may simply be the fear or anxiety of future harm." Id. (quoting Denney, 443 F.3d at 264). An injury in fact, however, must still be particularized and concrete. Lujan, 504 U.S. at 560. For an injury to be "particularized" it must affect Plaintiffs in a "personal and individual way." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016). For an injury to be "concrete" it must actually exist, meaning that it is "real," not "abstract" but it need not be "tangible." Id. at 1548-49.

Because Plaintiffs seek prospective relief, in the form of a declaration and injunction preventing Defendants from conducting future searches (Compl. at pp. 19-20), Plaintiffs "cannot rely on past injury to satisfy the injury requirement but must [instead] show a likelihood that [they] will be injured in the future." Deshawn E. ex rel. Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998). This future injury, or "imminent" danger, requirement is an "elastic concept." Lujan, 504 U.S. at 564 n.2. Plaintiffs can show that they face a sufficient likelihood of future harm by plausibly alleging that "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur."[6] See Susan B. Anthony List v. Driehaus, 573 U.S.

---

[6] Defendants argue that only the "certainly impending," rather than the "substantial risk," standard for showing imminent harm applies here. (See Defs. Reply at 3-4.) In support of this argument, Defendants first rely on dicta in this court's decision in Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 149 n.3 (E.D.N.Y. 2017), in which the court expressed uncertainty as to "when one or the other standard should be applied" and "whether those standards are distinct." Id. The court recognized, however, that other courts have applied the substantial risk test as a "potentially lower" standard in the context of assessing pre-enforcement challenges to government actions, and, in any event, the court expressly declined to "wade into these questions" because the plaintiff in Cohen "relie[d] wholly on possible future injuries untethered from any allegation as to the likelihood or imminence of their occurrence that are insufficient under either standard." Id.

The court rejects Defendants' contention that, as Defendants also argue, the substantial risk standard is inapplicable here because "the present case does not involve the threat of prosecution, or any civil or criminal penalty." (Defs. Reply at 4.) Defendants offer no case law to support this limitation, and other courts have rejected similar attempts to limit the applicability of the substantial risk standard. See, e.g., New York v. U.S. Dep't of Commerce, 315 F. Supp. 3d 766, 782 (S.D.N.Y. 2018) (rejecting the defendant's argument that the substantial risk

149, 158 (2014) (citation and internal quotation marks omitted). Finally, while a past injury alone is insufficient to establish standing to seek prospective relief, a court may consider a past injury as "evidence bearing on whether there is a real and immediate threat of repeated injury."[7] O'Shea v. Littleton, 414 U.S. 488, 496 (1974).

### b.    Application

The court finds that Plaintiffs satisfy the injury in fact element because they have plausibly alleged that they face a sufficient likelihood of experiencing another search. While Plaintiffs allege that they have only been subjected to one prior search, they have proffered numerous statements from Defendants admitting that this search was part of a "routine" practice conducted pursuant to a formal "policy." (See Compl. ¶¶ 49-50, 56-57, Russo Emails.) The Second Circuit has found that alleging the existence of these two factors is generally sufficient for a plaintiff who has been injured by a practice once before to have standing to seek prospective relief. See Deshawn E., 156 F.3d at 345 (finding that the plaintiff, who sought prospective relief from an NYPD interrogation practice and had been the subject of one prior interrogation, proved a likelihood of recurring injury where the challenged interrogation practice

---

test applies only in a limited number of cases and applying the standard to a challenge to a government action that did not involve the threat of criminal or civil prosecution). Further, while it is true that neither the Supreme Court nor the Second Circuit have provided detailed guidance on the burden of proof demanded by the substantial risk standard, the Supreme Court has distinguished the substantial-risk standard from the certainly-impending standard to the extent that the former is a probabilistic standard that does not "require plaintiffs . . . [to] demonstrate that it is literally certain that the harms [plaintiffs] identify will come about." See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 n.5 (2013). Accordingly, Plaintiffs need only show that there is a substantial probability—a risk rather than a certainty—that Plaintiffs will experience another search in the future.

[7] Defendants further insist that the court should apply an "especially rigorous" standing inquiry derived from Raines v. Byrd, 521 U.S. 811, 819 (1997), because Plaintiffs are requesting that the court declare the action of another branch of the federal government unconstitutional. (See Defs. Mem. at 8.) Plaintiffs respond that Raines's rigorous standing analysis is inapplicable here because the facts in Raines were "exceptional," as they involved individual members of Congress challenging the constitutionality of a recently passed law. (Pls. Opp'n at 7-8.) Plaintiffs also argue that Raines is inapplicable because "[c]ourts have repeatedly and expressly declined to apply" Raines's "especially rigorous" analysis to "dispute[s]" arisi[ng] out [of] conduct vis-à-vis private citizens rather than . . . where one branch of government was challenging the actions of another." (Id. at 8.) The court need not resolve this issue because the court finds that Plaintiffs' extraordinary factual showing at this early stage in the litigation supports Plaintiffs' standing to seek prospective relief.

15

was conducted pursuant to a formal policy and the defendants planned to continue employing the practice).

Rather than deny the existence of any policy or routine practice, Defendants repeatedly defended the search as "not a new policy" and explained that it is "not unusual for [Defendants] to assist [their] fellow law-enforcement agencies" in this "routine" manner. (See Compl. ¶¶ 63-64.) At the pleading stage, the court accepts Plaintiffs' allegations about Defendants' statements as true and draws the reasonable inference that Defendants meant what they said: that the search was conducted pursuant to a formal policy and is a routine practice. In turn, the court finds that these factors establish that Plaintiffs, who are frequent domestic airline travelers, face a substantial risk of experiencing another search in the future. (See id. ¶¶ 9, 11-12, 15, 17-19.)

Defendants vigorously dispute that their statements are sufficient to establish standing. For support, Defendants rely on the Supreme Court's decision in City of Los Angeles v. Lyons, 461 U.S. 95 (1983). (See Defs. Reply at 2-3.) In Lyons, the plaintiff, who was subjected to a chokehold by officers of the Los Angeles Police Department (the "LAPD") during a traffic stop, brought an action against the LAPD seeking damages for the chokehold and an injunction against the LAPD's continued use of chokeholds to subdue suspects. 461 U.S. at 97-98. The Supreme Court found that the plaintiff had standing to seek damages for the past chokehold, but the Court held that the plaintiff did not have standing to seek injunctive relief because he failed to show that there was a substantial likelihood that he would be subjected to another chokehold in the future.[8] See id. at 107-12. The Court emphasized that it was only "speculation" that a police officer would employ a chokehold against the plaintiff in a future traffic stop, because the plaintiff would first have to engage in unlawful conduct and be stopped by an officer, and the

---

[8] The court notes that, unlike the plaintiff in Lyons, Plaintiffs here are not seeking money damages as relief for the JFK search. They seek only declaratory and injunctive relief to prevent future searches. (See Compl. at 19-20.)

officer would have to exercise his or her discretion to employ a chokehold. See id. at 108; see also Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004) (finding the plaintiff's reliance on an "accumulation of inferences" rendered his risk of future injury "too speculative and conjectural to supply a predicate for prospective injunctive relief"). Further, the Court relied on the fact that the LAPD had not promulgated any formal policy that encouraged officers to employ chokeholds. Lyons, 461 U.S. at 110. On the contrary, the Court found it significant that the LAPD had advised officers to refrain from employing a chokehold except "when lesser degrees of force do not suffice." Id. The Court thus found that the plaintiff did not face a sufficient likelihood of future injury and that his claim for prospective relief was too generalized. See id. at 111.

The court finds that Plaintiffs' case can be distinguished from Lyons for at least four reasons. First, for the reasons explained below in the court's discussion of Plaintiffs' APA claim, the court finds that Plaintiffs have plausibly alleged that the JFK search was conducted pursuant to a formal policy or its functional equivalent. Compare Deshawn E., 156 F.3d at 344-45 ("[T]his case is distinguishable from Lyons because, in Lyons, there was no proof of a pattern of illegality as the police had discretion to decide if they were going to apply a choke hold and there was no formal policy which sanctioned the application of the choke hold" (emphasis added)); with Lyons, 461 U.S. 110 n.9 ("The dissent does not . . . point to any written or oral pronouncement by the LAPD or any evidence showing a pattern of police behavior that would indicate that the official policy would permit the application of [chokeholds on suspects who refrained from engaging in unlawful conduct].") Unlike the LAPD in Lyons, Defendants here openly acknowledged that the search was conducted pursuant to a policy—and "not a new one" at that—and have admitted that it is "not unusual for [Defendants] to assist [their] fellow law

17

enforcement agencies" in this manner. (Compl. ¶ 63.) Defendants have even noted that they "often receive" such requests for assistance from their law enforcement partners pursuant to this policy. (See id. ¶ 57.) Thus, as opposed to the unusual circumstances where the Court in Lyons found the LAPD's chokehold policy would apply, here, Defendants' search policy appears to be enforced simply at the "not unusual" request of another law enforcement agency. (See id. ¶¶ 57, 63.) It thus requires far less speculation to find that Plaintiffs will be subject to Defendants' search policy in the future.

Second, Lyons is distinguishable given the substantial allegations in Plaintiffs' complaint about the widespread and "routine" nature of Defendants' searches. (Compl. ¶ 64.) As Defendant Russo put it, Defendants conduct this sort of search "every day." (See id. Russo Emails.) Other courts that have considered Lyons often find that a policy or practice that is widespread is more likely to cause recurring injury than an isolated practice. Compare Floyd v. City of New York, 283 F.R.D. 153, 170 (S.D.N.Y. 2012) (finding the "frequency of alleged injuries inflicted by the" stop and frisk practice "at issue . . . creates a likelihood of future injury sufficient to address any standing concerns"), with McLennon v. City of New York, 171 F. Supp. 3d 69, 105-06 (E.D.N.Y. 2016) (finding the plaintiffs lacked standing to challenge NYPD checkpoints along a highway the plaintiffs used and distinguishing Floyd on the basis that the plaintiffs failed to allege that the practice was "documented as widespread"); see also Allee v. Dedrano, 416 U.S. 802, 815 (1974) ("Where, as here, there is a persistent pattern of police misconduct, injunctive relief is appropriate.").

While Plaintiffs only allege that they have experienced one prior search, and do not allege the existence of any other particular searches of this nature, "there is no per se rule requiring" that they allege the existence of "more than one past act, or any prior act, for that

matter, as a basis for finding a likelihood of future injury." See Roe v. City of New York, 151 F. Supp. 2d 495, 503 (S.D.N.Y. 2001). Instead, Plaintiffs rely on far more compelling evidence than personal anecdotes to demonstrate the widespread nature of Defendants' practice: They have submitted statements from the Defendants themselves describing the challenged search as part of a "routine" and "not unusual" practice. (See Compl. ¶ 63-64.) Once again, at this stage in the litigation, the court takes the Defendants at their word and infers that the challenged search is part of a widespread practice—the existence of which significantly increases the likelihood that Plaintiffs will be subjected to another search the next time they engage in domestic airline travel.

Third, the court finds that Plaintiffs have shown that they are more likely than simply "any other citizen" to be subjected to another search in the future. Lyons, 461 U.S. at 111. Specifically, Plaintiffs allege that they are frequent domestic airline travelers who travel through JFK, where the challenged search occurred and where Defendants admit to "routine[ly]" conducting similar searches. (Compl. ¶¶ 9, 11-12, 15, 17-19, 64.) Other courts have found that a plaintiff is more likely to experience a recurring injury when the plaintiff alleges that the defendant's challenged conduct is widespread and implicates a particular activity or location that the plaintiff engages in or travels to frequently. Compare Roe, 151 F. Supp. 2d at 502-03 (finding plaintiffs who frequented a legal safe injection site had standing to seek prospective relief against the NYPD's practice of arresting visitors to injection sites because the plaintiffs alleged a widespread pattern of arrests at a specific site, despite the fact that the plaintiffs had only been arrested there once before), with McLennon, 171 F. Supp. 3d at 105-06 (finding plaintiffs who had been stopped once by an NYPD highway checkpoint lacked standing because

they merely alleged that they generally planned to "continue to drive on New York City roadways" and failed to allege that the checkpoints constituted a widespread practice).

Here, Plaintiffs' frequent domestic airline travel, in conjunction with Defendants' admitting to frequently conducting searches at the airport, establishes that Plaintiffs face a particularized risk of experiencing another search during one of their future domestic flights.[9] Cf. Ligon v. City of New York, 925 F. Supp. 2d 478, 522 n.320 (S.D.N.Y. 2013) (finding that "in light of the frequency of unlawful trespass stops" in certain designated areas, "even those plaintiffs who have only been subjected to such a stop one time would likely have standing" to challenge the stops, "provided that they continue to live in or visit" such areas); An v. City of New York, No. 16-CV-5381 (LGS), 2017 WL 2376576, at *5 (S.D.N.Y. June 1, 2017) (finding the plaintiff, who had been arrested once by the NYPD for filming police, had standing to seek prospective relief from this arrest practice because he alleged that he "continue[d] to film public police activity about twice per month and that this conduct will bring him into contact with police officers"). Defendant Russo's email exchange explaining the "every day" nature of the challenged search strongly supports Plaintiffs' allegation that this practice is widespread. (Compl. ¶ 65.) Thus, as frequent domestic airline travelers, Plaintiffs face a particularly high risk of experiencing another search when they return to JFK.

Fourth, unlike the plaintiff in Lyons, Plaintiffs' risk of experiencing recurring harm does not depend on their engaging in unlawful activity, a distinction that other courts have found

---

[9] Citing Lujan, Defendants argue that Plaintiffs must allege specific and "concrete plans" to travel again. (Defs. Mem. at 9-10 (citing Lujan, 504 U.S. at 564.) As Plaintiffs point out, however, Lujan involved a post-discovery motion for summary judgment, while Defendants here have moved for a dismissal prior to the completion of discovery. (Pls. Opp'n at 15 n.3.) At the motion-to-dismiss stage, the court finds that Plaintiffs' allegation that they are frequent domestic airline travelers is sufficient. While the court confines its analysis to Plaintiffs' well-pleaded allegations, the court notes that Defendants have submitted additional materials in their reply that support the allegation that the Plaintiffs are frequent domestic airline travelers. (See Defs. Reply at 5 (indicating that "Plaintiffs have traveled on a combined total of at least 165 domestic flights" between January 2016 and April 2018).)

significant. See Floyd, 283 F.R.D. at 169-70 ("[U]nlike the plaintiff in Lyons. . . [the plaintiff's] risk of future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law."); Roe, 151 F. Supp. 2d at 503-04 (collecting cases and distinguishing Lyons on the basis that plaintiffs were engaging in lawful behavior). Like the plaintiffs in Floyd and Roe, Plaintiffs here face a substantial risk of experiencing another search simply by continuing to engage in the lawful activity of domestic airline travel.

As a result, the court finds that Plaintiffs' case is distinguishable from Lyons and that Plaintiffs have plausibly alleged that they face a sufficient likelihood of being subjected to another search by Defendants in the future. Plaintiffs therefore satisfy the injury in fact element of Article III standing.

### 2. Causal Connection

Defendants do not appear to dispute that Plaintiffs satisfy the causation element of standing. Where, as here, a plaintiff challenges the legality of a government action, and the plaintiff alleges that he or she was the "object of the [challenged] action . . . at issue," then "there is ordinarily little question that the [challenged] action or inaction has caused [the plaintiff] injury." Lujan, 504 U.S. at 561-62. Plaintiffs were the direct objects of the JFK search at issue in this case. (See Compl. ¶ 1.) Defendants do not deny that the search was caused by the same policy and practice that Plaintiffs are now challenging in this action. (See id. ¶¶ 61-65.) Plaintiffs have therefore plausibly allegedly that Defendants' policy and practice of searching domestic airline passengers caused Plaintiffs injury.

### 3. Redressability

Defendants also do not appear to dispute that Plaintiffs satisfy the redressability element of the standing analysis. The redressability element "focuses on whether a plaintiff 'personally

21

would benefit in a tangible way from the court's intervention.'" Chevron Corp. v. Donziger, 833 F.3d 74, 121 (2d Cir. 2016) (quoting Warth, 422 U.S. at 508). As with the causation element, when a plaintiff alleges that he or she was the direct object of the challenged government action, there is "ordinarily little question" that a court can grant prospective relief that redresses the plaintiff's injuries. Lujan, 504 U.S. at 561-62. This is the case here. The court could redress Plaintiffs' past and potential injuries by enjoining Defendants from continuing to enforce their alleged policy and practice of searching domestic airline travelers.

For these reasons, the court finds that Plaintiffs have standing to seek declaratory and injunctive relief challenging the Defendants' alleged policy and practice of searching domestic airline passengers.[10]

## C.    Plaintiffs' APA Claim

Defendants move to dismiss Plaintiffs' APA claim on the basis that Plaintiffs cannot show final agency action.[11] (Defs. Mem. at 5.) Under the APA, an agency's action is subject to

---

[10] The court also finds that Plaintiffs satisfy the statutory jurisdictional requirements for seeking declaratory relief. Under the Declaratory Judgment Act, federal courts have jurisdiction "[i]n a case of actual controversy" to grant declaratory relief that "declare[s] the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The only prerequisite for granting such relief is that the court must "satisfy itself that the matter presents an actual case or controversy." U.S. Underwriters Ins. Co. v. Orion Plumbing & Heating Corp., 321 F. Supp. 3d 313, 316 (E.D.N.Y. 2018). This requirement incorporates—and is coextensive with—Article III's injury in fact requirement. See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) ("[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III. (internal citation and quotation marks omitted)). For the same reasons why the court finds that Plaintiffs have standing under Article III to seek prospective relief, the court also finds that Plaintiffs satisfy the Declaratory Judgment Act's jurisdictional requirements.

[11] Defendants do not specify whether their motion to dismiss Plaintiffs' APA claim is brought under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, or 12(b)(1) for lack of standing. (See Defs. Mem. at 5 n.2.) Courts within this circuit analyze the final agency action question under both standards. Compare Friends of Hamilton Grange v. Salazar, No. 08-CV-5220 (DLC), 2009 WL 650262, at *22 n.13 (S.D.N.Y. Mar. 12, 2009) (applying 12(b)(6)), with 6801 Realty Co., LLC v. U.S. Citizenship & Immigration Servs., 719 F. App'x 58, 59 n.1 (2d Cir. 2018) (summary order) (noting that the final agency action requirement is a "question of 'statutory standing' that permits 'resolving the case on a threshold, non-merits grounds'" (quoting In re Facebook, Initial Pub. Offering Derivative Litig., 797 F.3d 148, 156 n.6 (2d. Cir. 2015))). Regardless of whether Defendants' bring their motion under 12(b)(6) or 12(b)(1), in order to survive a motion to dismiss Plaintiffs must allege facts that

22

judicial review if it is either "made reviewable by statute" or if it is "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Plaintiffs do not point to any statute entitling them to judicial review of Defendants' search. Thus, in order to seek judicial review under the APA of Defendants' search, Plaintiffs must plausibly allege that Defendants conducted the search pursuant to final agency action for which there is no other adequate remedy in a court.

In order for agency action to be final, two conditions must be met. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Salazar v. King, 822 F.3d 61, 82 (2d. Cir. 2016) (quoting Bennett v. Spear, 520 U.S. 154, 177-78 (1997)); see also U.S. Army Corps of Eng'rs v. Hawkes Co., 136 S. Ct. 1807, 1813 (2016). The Supreme Court has directed that the finality element be interpreted pragmatically. Hawkes Co., 136 S. Ct. at 1815; see also Salazar, 822 F.3d at 82 ("The Supreme Court has interpreted the finality element in a 'pragmatic way.'" (citation omitted)); Paskar v. U.S. Dep't of Transp., 714 F.3d 90, 97-98 (2d Cir. 2013), as corrected (Apr. 22, 2013) (considering the "substantial practical impact" of the agency's letter in determining whether the agency's decision was final).

Applying this flexible and pragmatic standard to the facts here, the court finds that at this early stage in litigation Plaintiffs have plausibly alleged final agency action. First, the finality requirement is met here. Based on the numerous statements cited in the complaint from

---

"affirmatively and plausibly suggest that they ha[ve] standing to sue." Reyes v. Sofia Fabulous Pizza Corp., No. 13-CV-7549 (LAK) (JCF), 2014 WL 12768922, at *2 (S.D.N.Y. Apr. 7, 2014), report and recommendation adopted, 2014 WL 1744254 (S.D.N.Y. Apr. 24, 2014). The court need not resolve this complex issue, which the parties have not fully briefed, since Plaintiffs have plausibly alleged the existence of a final agency action under either standard.

spokespersons for the CBP, (see Compl. ¶¶ 50-68, Russo Emails) the court finds that Plaintiffs have adequately alleged the existence of a policy or routine practice of CBP conducting identification searches of disembarking domestic airline passengers. Plaintiffs allege the following facts in support of their claim that Defendants conducted the JFK search pursuant to a policy or regular practice:

(1) In a public statement released on February 23, 2017, CBP noted that they "often receive[] requests from our law enforcement partners to assist in various ways, including identifying a person of interest . . . [and] CBP will assist when able to." (Id. ¶ 57.)

(2) In response to Plaintiff Amadei asking the Defendant Doe Officers why the passengers had been searched, one of the Doe Officers told her that "it's not for you to worry about; we do it from time to time," or words to that effect. (Id. ¶ 50.)

(3) In response to a media inquiry, a CBP spokesperson stated that such identification checks are "not a new policy" and that it is "not unusual for us to assist our fellow law-enforcement agencies." (Id. ¶ 63.)

(4) In response to a separate media inquiry, a DHS official asserted that "such searches and collaboration between CBP and ICE are 'routine.'" (Id. ¶ 64.)

(5) In an email exchange, Defendant Russo asserted that CBP "do[es] this every day. Someone took a picture and put it on twitter. That's what led to the hysteria."[12] (Id. ¶ 65.)

---

[12] As discussed above, Defendants provide a declaration from Defendant Russo in their motion to dismiss which states that his statement "did not express, nor did it intend to express, that there is a CBP policy or practice of checking identification of all passengers disembarking U.S. domestic flights, or all passengers disembarking a single U.S. domestic flight." (Russo Decl. ¶ 4.) On a Rule 12(b)(6) motion this court cannot consider an affidavit submitted by Defendants. Kopec v. Coughlin, 922 F.2d 152, 155 (2d Cir. 1991). Further, even under the Rule 12(b)(1) standard, Defendant Russo's disclaimer of any policy is insufficient to controvert Plaintiffs' plausible

(6) In response to an inquiry from <u>Rolling Stone</u> as to what authority justified the search,

      CBP responded by citing a written policy statement entitled "CBP Search Authority,"

      which incorporates a formal regulation, 19 C.F.R. § 162.6. (<u>Id.</u> ¶ 68.)

Defendants contend that the complaint does not allege an "official policy," but rather,

only "allege[s] that Defendants took certain action with respect to [Plaintiffs] and asks the [c]ourt

to surmise therefrom the existence of a broader policy." (Defs. Mem. at 6.) The court disagrees.

As an initial matter, the court notes that, at the motion-to-dismiss stage, the court is <u>required</u> to

draw all reasonable inferences in Plaintiffs' favor. Here, this includes drawing inferences that

support the existence of an official policy. <u>Iqbal</u>, 556 U.S. at 662. Further, numerous courts

have found that a plaintiff can satisfy the finality requirement without offering evidence of a

formal or official statement regarding the agency's position. <u>See, e.g.</u>, <u>De La Mota v. U.S. Dep't</u>

<u>of Educ.</u>, No. 02-CV-4276 (LAP), 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) ("[I]t is

of no moment that the agency action here came in the form of an 'informal' email

correspondence between a DOE employee and the law schools and plaintiffs. The practical effect

of the DOE's action, not the informal packaging in which it was presented, is the determining

factor in evaluating whether the DOE's action was 'final.'"); <u>Her Majesty the Queen in Right of</u>

<u>Ontario v. EPA</u>, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (finding that "the absence of a formal

statement of the agency's position, as here, is not dispositive"); <u>Venetian Casino Resort LLC v.</u>

<u>EEOC</u>, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no

doubt" that a policy exists, even though "the details . . . are still unclear"); <u>R.I.L-R v. Johnson</u>, 80

F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action, however, need not be in writing to be final

---

allegations that demonstrate otherwise. <u>Kamen v. Am. Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986) ("[I]t was improper for the district court, in ruling on the 12(b)(1) motion, to have considered the conclusory and hearsay statements contained in the affidavits submitted by defendants . . .").

and judicially reviewable."); Grand Canyon Tr. v. Pub. Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable). Here, Defendants have repeatedly stated that there is a policy and even pointed to regulations that purportedly authorize such a policy. Defendants cannot, now, have their cake and eat it too: They responded to various media inquiries by saying that they were following a policy, and the court will take them at their word. See FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 239 (1980) (finding that denying review of an agency action that is essentially conceded but ostensibly unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted "pragmatic[ally]"); Grand Canyon Tr., 283 F. Supp. 2d at 1252 (noting that an agency cannot be allowed "to shield its decisions from judicial review simply by refusing to put those decisions in writing").

Given CBP's numerous acknowledgements of the existence of a policy, the court finds that Plaintiffs have plausibly alleged that CBP officers were acting pursuant to not only a policy, but a "routine" policy that isn't "new."[13] (Id. ¶¶ 63-64.) Cf. Nat'l Wildlife Fed'n v. Benn, 491 F. Supp. 1234, 1241-42 (S.D.N.Y. 1980) ("Practices and procedures consistently followed by the [agency] in issuing permits and approving projects should be equally subject to judicial review,

---

[13] Defendants note that the authors of the media reports quoted in the complaint "do not speak on behalf of CBP." (Defs. Mem. at 6).) Defendants' objection is irrelevant, however, because the complaint cites statements not from the authors of the articles, but from CBP and DHS spokespersons themselves. (Compl. ¶¶ 61-64.) The court certainly affords great weight to the statements of CBP officials—no matter their seniority—who are authorized to speak to the public about CBP's policies. Cf. W. Ill. Home Health Care, Inc. v. Herman, 150 F.3d 659, 663 (7th Cir. 1998) ("Campbell's relatively low position within the Department as a whole does not deprive the decision of finality."). And Defendants do not even appear to deny that their spokespersons made these statements. Moreover, to the extent that Defendants claim that Plaintiffs misconstrue Defendants' statements, which Defendants assert merely referred to general cooperation between CBP and other law enforcement agencies (Defs. Mem. at 7), the court, at this stage in the litigation, must resolve this disagreement in favor of Plaintiffs' reasonable interpretation of Defendants' statements. Finally, Defendants assert that the complaint's reference to the CBP Search Authority document and 19 C.F.R. § 162.2 are "not relevant to the review of the identification of passengers arriving on a domestic flight." (Id.) The court finds it inappropriate at this stage in the litigation to accept Defendants' argument about the extent to which the CBP Search Authority document was relevant to the search at issue. See Friedl v. City of New York, 210 F.3d 79, 83-84 (2d Cir. 2000) ("[A] district court errs when it . . . relies on factual allegations contained in legal briefs or memoranda . . . in ruling on a 12(b)(6) motion to dismiss.")

particularly when the issues are well defined and do not require a specific factual setting.")

Other courts have found a defendant agency's behavior relevant to inferring the existence of a

policy. In U.S. Gypsum Co. v. Muszynski, 161 F. Supp. 2d 289 (S.D.N.Y. 2001) (Rakoff, J.),

the plaintiff, a sediment disposal company, requested judicial review of an EPA policy that

prevented the plaintiff from receiving a permit. The EPA moved to dismiss the action for lack of

subject matter jurisdiction on the ground that, inter alia, no final agency action was

taken. See id. at 290. In denying the EPA's motion, the court held that despite the EPA's

disclaimer of their former policy, an agency's "'own behavior may belie the claim that its

interpretation is not final.' . . . Ultimately, where an agency's decision is given practical effect, it

will be sufficient to trigger judicial review." Id. at 291 (alterations adopted) (quoting Whitman v.

Am. Trucking Ass'ns, 531 U.S. 457, 479 (2001)); see also Aquavella v. Richardson, 437 F.2d

397, 404-05 (2d Cir. 1971) ("[W]hether an agency action is final for purposes of the APA should

not depend on semantic characterizations but rather on a careful evaluation of the separate but

coordinate functions of courts and administrative agencies and of the impact of the challenged

action on the parties.").

Plaintiffs also satisfy the second requirement of the Bennett test because they have

plausibly alleged that Defendants relied on a policy to search Plaintiffs as they disembarked from

a domestic flight, an effect that had significant legal consequences for Plaintiffs. See De La

Mota, 2003 WL 21919774, at *8 ("Indeed, there is no question that the DOE's position was both

definitive and had a direct and immediate effect."). Defendants' execution of this policy has

already imposed tangible legal consequences on Plaintiffs, who allege that they were stopped and

searched in violation of their Fourth Amendment rights. (Compl. ¶¶ 91-94.)

In sum, Defendants' own statements and actions, as extensively documented in the complaint, bear all of the critical indicia of finality. Defendants readily admit that they had already determined Plaintiffs' rights as domestic airline passengers through a "routine" policy. Plaintiffs then faced the legal consequences of this policy when Defendants searched and seized them as Plaintiffs disembarked from Flight 1583. Through their actions, Defendants have thus "voluntarily relinquished the benefit of postponed judicial review." Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 436 (D.C. Cir. 1986). Accordingly, the court finds that the finality requirement of § 704 does not bar judicial review of Defendants' search policy under the APA.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 32) is DENIED. Defendants' motion to dismiss Plaintiffs' APA claim is DENIED. Defendants' motion to stay discovery pending a decision on Defendants' motion to dismiss (Dkt. 70) is DENIED as moot.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
December 13 , 2018

NICHOLAS G. GARAUFIS
United States District Judge